[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 3, 2009
THOMAS K. KAHN
CLERK

No. 07-15528

D. C. Docket No. 04-00333-CV-RH-EMT

BRUCE DOUGLAS PACE,

Petitioner-Appellant,

versus

WALTER A. MCNEIL,
BILL MCCOLLUM,

Respondents-Appellees.

Appeal from the United States District Court
for the Northern District of Florida

(February 3, 2009)

Before TJOFLAT, WILSON and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner Bruce Douglas Pace, a Florida death-row inmate, appeals the judgment of the United States District Court for the Northern District of Florida denying his petition for writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254. His appeal presents one issue: whether trial counsel rendered ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, by failing to investigate and present evidence of Pace's substance abuse to his mental health experts and thereafter to the jury during the penalty phase of his capital trial.[1] We resolve this issue against Pace and accordingly affirm.

## I.

### A.

The events in this case took place in November 1988 in and around Bagdad, Florida, a small town in Santa Rosa County. In the evening of November 4, 1988, Frankie Covington, the daughter-in-law of Floyd Covington, a taxicab driver, contacted the Santa Rosa County Sheriff's Office and reported Floyd Covington missing. Three days later, Sheriff's deputies found Covington's bloodstained taxicab in a wooded area near Bagdad. Bloodstain patterns indicated that a

---

[1] Pace's petition asserted six separate constitutional claims. The district court denied all six. Pace filed a notice of appeal and the district court issued a certificate of appealability pursuant to 28 U.S.C. § 2254(c) limiting his appeal to one issue: Whether penalty phase counsel rendered ineffective assistance in the "failure to develop and present sentencing mitigation evidence (including lay and expert testimony) relating to substance abuse." We have framed the issue in different language for convenience of discussion.

passenger shot Covington while Covington was sitting in the taxicab's driver's seat. On November 10, investigators found Covington's body in another wooded area approximately twelve miles from where the taxicab was located. Covington had been shot twice in the chest with a shotgun. A shotgun shell was found inside Covington's chest cavity, indicating that the shotgun had been fired at a very close range. The medical examiner's office fixed the time of death as sometime on November 4.

On December 14, 1988, a Santa Rosa County grand jury returned a two-count indictment against Bruce Douglas Pace charging Pace with first-degree murder and armed robbery. At his arraignment, the Santa Rosa County Circuit Court declared Pace indigent and appointed two lawyers, Samuel Hall and Randall Etheridge, to represent him.[2] Pace admitted to these attorneys that he killed Covington but, as was his right, he entered a plea of not guilty and stood trial before a jury. The State sought the death penalty.

---

[2] Hall and Etheridge were assistant public defenders in the office of the Public Defender for the First Judicial Circuit of Florida, which consists of four counties: Santa Rosa, Walton, Okaloosa, and Escambia. Hall and Etheridge were stationed in Milton, the county seat of Santa Rosa County. Kim Skievaski and Richard Hill, assistant state attorneys in the office of the State Attorney for the First Judicial Circuit of Florida, served as counsel for the State. The pre-trial and trial proceedings took place in Milton.

B.

The trial began in the Santa Rosa County Circuit Court on August 23, 1989, before Judge Ben Gordon. The State presented evidence that Pace and Covington were close friends and saw each other almost daily. Pace was twenty-nine years old; Covington was seventy years old and on Social Security. Though they were not related, Covington was like an uncle to Pace.

Angela Pace, a cousin, testified that, on November 3, Pace told her that he was going to do something he "hated to do" because he needed money. Orestine Franklin, Pace's aunt, testified that she saw Pace driving Covington's taxicab the next day, November 4.

Michael Green, a childhood friend of Pace, testified that sometime during the day of November 5, he and Pace went to a wooded area adjacent to a vacant house to shoot squirrels with Pace's 12-gauge shotgun. Pace retrieved his shotgun from some shrubbery on the side of the vacant house; when they finished shooting, he left the shotgun on the front porch of the house.

Harvey Rich, Pace's stepfather, identified the shotgun as one owned by Pace's brother. Rich also testified that he found two shotgun shells in his front yard on the evening of November 5. These shells were identical to the shotgun shell found inside the victim's body.

After Rich identified the shotgun, he repeated a conversation he had with Pace on the morning of November 7. Pace lived with Rich and Pace's mother, Lillian Rich. On November 7, Pace, who had been away from the Rich home for several days, returned to the residence and told Rich that he was in trouble and needed to leave. When Rich sought an explanation, Pace related the following story. On the night of November 3, Covington drove Pace to Rich's house. After Covington dropped him off, Pace discovered that he had lost his house key, so he entered the house through an open window. When he went into his bedroom, someone choked him and he lost consciousness. He awoke in a wooded area several miles away, lying next to a shotgun and Covington's taxicab. When he noticed blood splattered about the cab, he took the shotgun and fled the scene. Harvey and Lillian Rich were at home at the time Pace claimed to have encountered the intruder in his bedroom. The prosecutor asked them whether they had later observed any signs of struggle in the house or in Pace's room. Both said that they had not.

In questioning Rich on cross-examination, Randall Etheridge, who served as lead defense counsel during the guilt phase of the trial, implied that an intruder could have been in the house and attacked Pace without awakening the Riches or leaving any signs of a scuffle. This questioning laid the groundwork for

Etheridge's closing argument to the jury that someone other than Pace killed Covington.

The State rested its case on August 25. Pace rested his case moments later without calling any witnesses. After closing argument and receipt of the court's instructions, the jury retired to deliberate. Two hours later, the jury returned a verdict of guilty on both counts of the indictment.

In the penalty phase, which began the next day, the State introduced, as an exhibit, a certified copy of a judgment of the Santa Rosa County Circuit Court dated December 4, 1981, adjudging Pace guilty of strong-arm robbery and sentencing him to prison for fifteen years. Robert Mann, a probation officer for the State of Florida, testified that Pace was on parole at the time of the Covington murder. Pace had been released from prison on August 20, 1986.

Samuel Hall, lead defense counsel for Pace in the penalty phase, called five witnesses.[3] Santa Rosa County corrections officer Paul Campbell testified that Pace was a model prisoner, "extremely cooperative," "respectful," and gave no trouble. Hurley Manning, Pace's high school football coach, testified that Pace

---

[3] Prior to trial, after evaluating the strength of the State's case, which they considered overwhelming, Hall and Etheridge concluded that Pace's best chance of a favorable verdict would be in the penalty phase. Because Hall had more experience than Etheridge, especially in capital cases, Etheridge was lead counsel in the trial phase and Hall was lead counsel in the penalty phase.

was hard working and the "type of kid that you would like to have in the program." Robert Settles, Pace's high school shop teacher who, after leaving teaching, had opened a truss manufacturing business and hired Pace to cut trusses, testified that Pace had been a master sawman with great potential but had not always been reliable. Evelyn Rich, Pace's aunt, testified that Pace was a "loving, caring person" who came from a good, supportive family. Finally, Pace's mother Lillian Rich pleaded compassionately for her son's life. She described how he worked to support the family when he was just thirteen years old after his stepfather left the home. She also testified that Pace suffered a head injury as a young child that rendered him unconscious.

In closing argument, the prosecutor argued that five aggravated circumstances dictated a death penalty verdict: (1) Pace was on parole at the time of the murder; (2) Pace had been previously convicted of a violent felony; (3) he committed the murder during a robbery; (4) Pace committed the crime to avoid arrest; and (5) he committed the murder for financial gain.[4] Hall, in response, argued that the prosecutor had exaggerated the aggravating circumstances. He

---

[4] See Fla. Stat. § 921.141(5) (1989) (listing aggravating circumstances in effect at the time of Pace's trial).

7

urged the jury to have mercy on Pace because Pace was a human being and a good person with a good heart.

The jury recommended by a vote of seven to five that Pace be sentenced to death.[5] The trial court followed the jury's recommendation and, on November 16, 1989, sentenced Pace to death for first-degree murder and fifteen years imprisonment for the armed robbery charge. The court found three aggravating circumstances: (1) Pace was on parole at the time of the murder; (2) Pace had been previously convicted of a violent felony; and (3) the murder was committed during the course of a robbery. The court found no mitigating circumstances.[6]

Pace appealed his convictions and death sentence to the Florida Supreme Court.[7] The supreme court affirmed Pace's convictions and death sentence, Pace v. State, 596 So. 2d 1034, 1035-36 (Fla. 1992), and the Supreme Court of the

---

[5] The record does not indicate the length of the jury's deliberation at the close of the penalty phase of trial.

[6] See Fla. Stat. § 921.141(6) (1989) (listing mitigating circumstances in effect at the time of Pace's trial). In addition to the statutory mitigating circumstances, the court took into account "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffer[ed] as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65, 57 L. Ed. 2d 973 (1978).

[7] The issue certified in the certificate of appealability, which we decide today, was presented to the state courts in Pace's motion for post-conviction relief. None of the issues presented to the supreme court on direct appeal are implicated in the instant appeal.

United States denied certiorari review, <u>Pace v. Florida</u>, 506 U.S. 885, 113 S. Ct. 244, 121 L. Ed. 2d 178 (1992).

## II.

On March 7, 1997, Pace, represented by court appointed counsel ("collateral counsel"), moved the Santa Rosa County Circuit Court to vacate his convictions and death sentence pursuant to Florida Rule of Criminal Procedure 3.850. The motion was assigned to Judge Paul Rasmussen, who presided over its disposition.[8]

Pace's motion presented twenty-one claims for relief, <u>Pace v. State</u>, 854 So. 2d 167, 170 n.2 (Fla. 2003), including the ineffective assistance of counsel claim now before us. That claim concerns the penalty phase of Pace's trial and focuses on the manner in which Samuel Hall dealt with Pace's addiction to crack cocaine—specifically, whether Hall's investigation into the extent of this addiction was adequate; whether he fully informed Pace's mental health experts about the addiction; and whether reasonably competent defense counsel would have treated the addiction as a mitigating circumstance and presented it to the jury at the penalty phase of the trial.

## A.

---

[8] John M. Jackson, Scott Mario, and Andrew Thomas, Assistant Capital Collateral Counsel in the Northern Region Office handled Pace's Rule 3.850 motion.

The circuit court held an evidentiary hearing on these three issues to give collateral counsel an opportunity to prove that Hall's performance was constitutionally deficient. To that end, collateral counsel summoned three groups of witnesses: (1) members of Pace's family or friends, Kenneth Bembo, Margaret Dixon, Barry Copeland, Melanie Pace, Ora Kay Jones, and Cynthia Jones; (2) the two mental health experts Hall retained to assist him in preparing for the penalty phase of the trial, Dr. James Larson, a psychologist, and Dr. Peter Szmurlo, a psychiatrist;[9] and (3) the two mental health experts collateral counsel retained, Dr. Barry Crown, a psychologist, and Dr. Michael Herkov, a psychiatrist. These witnesses' testimony is summarized below.

The first group of witnesses testified to Pace's use of crack cocaine.[10] The first group stated collectively that Pace used a significant amount of crack cocaine in the months preceding the murder. Kenneth Bembo estimated that Pace used between $50 to $100 of crack cocaine per day. Barry Copeland said that Pace used between $300 to $500 of crack cocaine per day. Several witnesses testified that when Pace used crack cocaine, he had poor hygiene and would act nervous

---

[9] Drs. Larson and Szmurlo also assisted Etheridge to determine whether Pace had a defense to the charges based on his mental condition at the time of the Covington murder. The doctors found no basis for such a defense.

[10] In addition to presenting the testimony of these witnesses in open court, collateral counsel submitted affidavits they had obtained from these witnesses.

and paranoid. These witnesses also testified that Pace abused alcohol while using crack cocaine.

Kenneth Bembo, Melanie Pace, and Ora Kay Jones said that Pace manifested these symptoms of crack cocaine abuse during the week preceding the murder. However, Cynthia Jones and Melanie Pace said that on the day before and day of the murder, although Pace appeared to have poor personal hygiene and smelled of alcohol, he did not seem to be under the influence of alcohol or drugs.

In cross-examination, the State showed that five of these witnesses had testified on deposition taken by defense counsel prior to Pace's trial.[11] Though questioned about Pace's drug use at that time, they did not offer the information they provided in the affidavits and at the evidentiary hearing.

The second group of witnesses consisted of Drs. Larson and Szmurlo. Hall retained Dr. Larson to evaluate Pace to determine whether any psychological mitigating factors could be developed for use in the penalty phase of the trial. Dr. Larson administered psychological tests and interviewed Pace. Based on the results of the psychological tests, Dr. Larson's observations of Pace during the interview, and the background information Hall provided, which he found

---

[11] The attorneys who prosecuted Pace did not represent the State in the Rule 3.850 proceeding. Assistant State Attorney John Molchan and Assistant Attorney General Curtis French represented the State.

11

sufficient for his purposes, Dr. Larson concluded that a psychological mitigating factor based on mental impairment was not present in Pace's case.[12] He reached this conclusion notwithstanding Pace's drug abuse. Though Dr. Larson noted in his report that Pace used crack cocaine regularly, he did not recommend that an addictionologist evaluate Pace's condition.

By the time collateral counsel called him to testify at the evidentiary hearing eleven years later, however, Dr. Larson had revised his thinking. Dr. Larson reached the view that Pace was drug dependent and in a "chronic cycle of abusing alcohol and drugs" at the time of the murder. Thus, he testified that Pace met the statutory mitigator of being substantially impaired at the time of the crime. Dr. Larson came to this view after reading the affidavits of the first group provided by collateral counsel.

Similarly, Dr. Peter Szmurlo met with Pace, conducted a psychiatric evaluation—which involved consideration of Pace's behavior history, the results of the psychological tests Dr. Larson administered, and Dr. Szmurlo's clinical observations of Pace—and was unable to identify a psychiatric mitigating

---

[12] At the time of Pace's sentencing, Fla. Stat. § 921.141 governed sentencing in death penalty cases. Fla. Stat. § 921.141(6) (1989). This lists as a mitigating circumstance: "(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."

12

circumstance.  Dr. Szmurlo was unable to do so even though Pace told Dr. Szmurlo that he used crack cocaine for three months prior to the murder.  Dr. Szmurlo believed that Pace was a crack cocaine addict.  Although he was not familiar with the mitigating circumstances listed in the Florida statute at the time he evaluated Pace, Dr. Szmurlo understood that being intoxicated, under the influence of drugs, or having a preexisting psychiatric condition at the time of a crime would constitute a mitigating factor.  However, in light of what Pace told Dr. Szmurlo about his mental and physical condition leading up to and around the time of the murder, Dr. Szmurlo concluded that Pace was not under the influence of drugs when he committed the crime.  As Dr. Szmurlo stated in his expert report to Hall, he found no mitigating psychiatric conditions "except for a rather heavy use of cocaine prior to the offense."  Like Dr. Larson, Dr. Szmurlo believed that he had sufficient information to evaluate Pace and did not recommend that an addictionologist assess Pace.

At the evidentiary hearing, Dr. Szmurlo testified that collateral counsel provided him the first group's affidavits which indicated that Pace's cocaine habit was of a longer duration and more severe than Dr. Szmurlo initially believed and that habit caused Pace to lose sleep and quit eating.  Assuming the truth of the affidavits' statements, Dr. Szmurlo opined that, at the time of the murder, Pace's

13

crack cocaine addiction substantially impaired his ability to conform his actions to the requirements of law.

The third group of witnesses consisted of Drs. Crown and Herkov. Collateral counsel hired Dr. Barry Crown, a psychologist, to perform a neuropsychological examination of Pace in 1994, six years after the murder. Dr. Crown testified that Pace was of average intelligence but his "intellectual efficiency" was significantly diminished such that he had the problem-solving abilities of a thirteen-year old child. Dr. Crown added that drug addiction increased the likelihood that a person with Pace's intellectual capabilities would engage in antisocial behavior.

Collateral counsel hired Dr. Michael Herkov because he was a psychiatrist with expertise in cocaine addiction. Dr. Herkov interviewed Pace on June 1, 2000 and testified that, based on that interview and his review of the documents including the reports of Drs. Larson and Szmurlo, Pace was a cocaine addict on a "cocaine binge" several days before the murder. However, Dr. Herkov testified that Pace did not use crack cocaine on the day of the murder or the previous day. Dr. Herkov opined that Pace's ongoing crack cocaine addiction and binge substantially impaired his ability to conform his behavior to the requirements of the law at the time of the murder.

The State countered collateral counsel's presentation with the testimony of

James Martin, a Public Defender Office investigator, and Samuel Hall. Martin

testified that he interviewed Pace on November 10, 1988, at the Santa Rosa

County Jail.[13] At that meeting, Pace admitted that he killed Covington. Pace told

Martin that he used crack cocaine but did not use it on the day before or the day of

the murder. Martin said that, during the interview, Pace was coherent and did not

appear to be under the influence of drugs or alcohol.

Hall testified that his penalty phase strategy was

> to try to tell the jury that Bruce Pace was somebody that had a life, a
> human being, he should be saved. . . . Even though he had this other
> charge, this strong arm robbery [conviction in 1981,] that it still was
> out of character for him to have committed this crime.

Hall knew that Pace was a crack cocaine addict but wanted to keep that fact from

the jury if at all possible because introducing evidence of Pace's drug use was a

"two-edged sword":

> Put on all of this good stuff to show what a good person he is, and
> then also, ladies and gentlemen, also by the way, he is [a] drug addict
> and a drug user. I just thought that it was a negative. And I could be

---

[13] Pace was not indicted until December 14, 1988, so the question arises as to why Martin would have met Pace at the jail on November 10. The record does not provide an explicit explanation, but it suggests that Pace had been arrested for violating Fla. Stat. § 790.23, prohibiting Florida felons from possessing a firearm. At Pace's arraignment on the charges in this case, Samuel Hall informed the court that he had been appointed to represent Pace in the unlawful possession of firearm case. It is possible that Martin went to the jail on November 10 to interview Pace about the unlawful possession of firearm charge.

15

wrong and it would be something that the jury can consider as a mitigator, but that was my reasoning. . . . There may be some people that just dislike people that use drugs and vote for death just because of that.

Hall made that strategic choice to portray Pace as a decent human being and to steer clear of the crack cocaine addiction for two reasons. First, Pace told Hall and Martin that Pace did not use drugs on the day of the murder or the previous day. Hall had no reason to believe that Pace was lying, so he made no attempt to locate someone who would testify that Pace was high on the day of or day before the murder.[14] Moreover, Pace's general useage of crack cocaine did not, in Hall's mind, constitute a strong mitigating circumstance. Second, neither Dr. Larson nor Dr. Szmurlo, who were aware of Pace's crack cocaine habit, suggested using intoxication as a mitigating factor. The doctors also ruled out as a mitigating circumstance evidence of brain damage, organic brain dysfunction, or serious mental disorder.

## B.

On July 11, 2001, the circuit court denied Pace's Rule 3.850 motion. The court denied relief after applying the two-pronged standard for ineffective

---

[14] When questioned on cross-examination why Hall thought Pace was telling the truth about being sober at the time of the murder, Hall replied, "Why would he lie to me about the drugs, the alcohol, or the being intoxicated, and tell me [that he murdered Covington,] something that is a lot worse than whether or not he used drugs or not?"

16

assistance of counsel enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In short, to satisfy that standard, a defendant "must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense." <u>Stewart v. Sec'y, Dep't of Corr.</u>, 476 F.3d 1193, 1209 (11th Cir. 2007).

With respect to the first prong, the circuit court saw no basis to find that Hall's performance was constitutionally deficient in preparing for and handling the penalty phase of trial. To the contrary, the court found that the investigation Hall conducted in preparing for that phase was thorough and that the strategy he chose to follow at trial was entirely reasonable. Having reached this decision, the court considered its <u>Strickland</u> analysis closed and denied Pace's ineffective assistance claim. The court also rejected Pace's other grounds for Rule 3.850 relief.

### III.

Pace appealed to the Florida Supreme Court from the denial. On May 22, 2003, the supreme court affirmed. <u>Pace v. State</u>, 854 So. 2d 167 (Fl. 2003).[15] We

---

[15] At the same time, Pace petitioned the supreme court for a writ of habeas corpus on the ground that the court-appointed attorneys who handled his direct appeal provided ineffective assistance of counsel. The court denied the writ and that decision is not implicated in this appeal.

may not disturb the supreme court's decision unless it "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Thus, we review in considerable detail and quote extensively from the supreme court's opinion finding no merit in the ineffective assistance claim at hand.

The Florida Supreme Court recited the applicable <u>Strickland</u> standard,[16] and then, applying that standard, considered the circuit court's findings of fact and conclusions of law.[17]

---

[16] The supreme court stated:

To establish a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052[, 2064], 80 L.Ed.2d 674 (1984). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Additionally, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

<u>Pace</u>, 854 So. 2d at 172 (citations omitted).

[17] The supreme court employed the following standard of review in reviewing the circuit court's disposition of Pace's claim:

[T]he performance and prejudice prongs are mixed questions of law and fact subject to a de novo review standard but . . . the trial court's factual findings are to be given deference. So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial

19

Pace claimed that Hall rendered ineffective assistance in preparing for and representing Pace in the penalty phase of the trial. Specifically, Pace articulated three areas of deficiency: (1) Hall's failure to adequately investigate Pace's addiction to crack cocaine; (2) Hall's failure to present to Drs. Larson and Szmurlo the evidence of crack addiction that an adequate investigation would have produced; and (3) Hall's failure to present such evidence to the jury.

With respect to the first deficiency, that Hall failed to adequately investigate Pace's crack cocaine addiction, the circuit court found, as summarized by the supreme court, that:

> Hall's [pre-trial] investigation consisted of the following: (1) deposing several witnesses; (2) utilizing an investigator to interview witnesses for potential mitigating evidence; (3) obtaining witness statements from the State; (4) obtaining Pace's school records; and (4) securing two mental health experts, psychologist Dr. James Larson and psychiatrist Dr. Peter Szmurlo, to examine Pace. . . . Pace consistently related to Hall that he was suffering from no drug-related effects at the time of the offense. . . . Hall interviewed several of Pace's friends and relatives regarding Pace's crack use but, as the postconviction court stated, "individuals close to Pace failed to disclose any information that either augmented or sharply contradicted Pace's own self reports of crack use."

court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.

Pace, 854 So. 2d at 172 (citations omitted).

20

The supreme court agreed with the circuit court that Hall's investigation into Pace's crack cocaine use was reasonable. Hall not only relied on Pace's repeated assertions to him—that he was not on the drug before or during the murder—but he also explored the subject with Pace's family and friends.

The supreme court then turned to Pace's second deficiency, that Hall rendered ineffective assistance by failing to provide Drs. Larson and Szmurlo further evidence of Pace's crack cocaine addiction, evidence that, according to collateral counsel, a reasonable investigation would have disclosed. The court found that "[collateral] counsel provided Dr. Larson and Dr. Szmurlo with recent affidavits from Pace's friends and family, the presentence investigation report for Pace's strong arm robbery [in 1981], and Pace's juvenile records." Id. at 174 n.5. From this information, the doctors knew and expressed in their reports that Pace abused crack cocaine but that he was not high on crack at the time he committed the charged offenses. Id. at 173. "Neither expert requested that Pace be evaluated by an addiction specialist nor indicated that [Pace's] crack use might have affected his mental health at the time of the offense." Id.

Pace contended that Drs. Larson and Szmurlo misdiagnosed Pace's mental condition and if Hall had provided them with "the information that postconviction counsel provided them, both experts would have found that both statutory mental

21

mitigators were applicable." Id. at 174. The circuit court held this contention

without merit for several reasons.

> First and foremost, trial counsel's investigation into [Pace's] drug use was reasonable based upon the representations of [Pace] and others. Second, counsel did not withhold any essential information from either expert that was within their possession. Third, neither expert believed at the time of the original evaluation that they had inadequate information to render a diagnosis nor requested additional information from counsel. Fourth, counsel did provide the experts with information that contained insight into [Pace's] background.
>
> The record reveals that counsel provided Szmurlo and Larson with police investigative reports that contained information pertaining to [Pace's] crack use, hygiene issues, emotional state, and the fact that he stayed in an abandoned house. Counsel also provided Dr. Larson with numerous pretrial statements and depositions. In addition to the background materials, each expert had an opportunity to interview [Pace] and Pace reported heavy crack use to both of them. Despite their knowledge of his crack use and aberrant behavior, both experts failed to develop the presence of organic brain damage or statutory mental mitigation during their initial evaluations. In addition, neither expert recommended that an addictions specialist examine Pace.
>
> Moreover, the fact that [Pace] has now secured favorable testimony of mental mitigation and brain damage from Dr. Michael Herkov and Dr. Barry Crown does not render counsel's investigation into mitigation ineffective. See Asay v. State, 769 So.2d 974, 986 (Fla.2000); Jones v. State, 732 So.2d 313, 320 (Fla.1999); Rose v. State, 617 So.2d 291, 294 (Fla.1993). See also Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir.1997) (stating "mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."). Counsel diligently obtained two mental health professionals to examine Pace prior to trial but those experts failed to provide counsel with

22

favorable information. As indicated above, counsel is not deficient for reasonably relying upon the opinions of Szmurlo and Larson and not seeking out additional experts. See Card v. Dugger, 911 F.2d 1494, 1513 (11 Cir.1990) (stating counsel is not required to shop for a psychiatrist who will testify in a particular way).

Furthermore, the fact that Szmurlo and Larson have now changed their diagnosis does not render counsel's background investigation ineffective. At the evidentiary hearing, Szmurlo and Larson both testified that they currently believe that Pace was suffering from an emotional disturbance at the time of the murder and his ability to conform his conduct to the requirements of the law was impaired. However, the information that Szmurlo and Larson attribute to this change in opinion is comprised primarily of individuals who have changed their accounts of Pace's behavior or other information that counsel had no reason to pursue due to the representations of [Pace] and others.

Of the 10 recently obtained affidavits that collateral counsel submitted to the experts, trial counsel had deposed five of the affiants prior to Pace's trial. Barry Copeland, Ella Mae Green, Melanie Pace, Cynthia Pace, and Hilda Pace were each questioned regarding Pace's drug use and none of these witnesses offered information they provided in the recent affidavits. Trial counsel cannot be deemed ineffective for failing to provide information to mental heath experts that the affiants chose not to disclose to counsel when originally questioned. As for the remaining affiants, trial counsel had no reason to pursue these individuals in light of the information they received from [Pace] and his friends and family.

Id. at 174-75. The supreme court held that the evidence before the circuit court supported its factual findings. Reviewing de novo the circuit court's conclusion of law that Hall was not ineffective in failing to disclose to Drs. Larson and Szmurlo the evidence provided by the ten affiants collateral counsel obtained, the supreme

23

court held that the failure did not constitute ineffective assistance.   Id. at 176.

The supreme court then considered the third deficiency, that Hall was ineffective in failing to present to the jury evidence of Pace's addictive abuse of crack cocaine.  The circuit court "concluded that 'given the unfavorable psychological opinions [by Drs. Larson and Szmurlo], counsel's tactical decision to humanize [Pace] and not present any evidence of his drug use was a reasonable strategy.'"  Id. at 173.  The supreme court held that the circuit court's finding that Hall made an informed "strategic decision to present Pace's positive attributes over evidence of his crack use" was supported by "substantial competent evidence."  Id.  In reaching this holding, the supreme court rejected Pace's argument that Hall and the circuit court erroneously relied upon the assumption that Pace had to be under the influence of drugs at the time of the offense:

> [W]e do not find that either Hall or the postconviction court relied upon such an assumption. Hall's testimony was that in his experience, Pace's cocaine addiction would only be considered "significantly" mitigating if some effect of the addiction could be linked to Pace's conduct at the time of the offense. Because Pace continued to assert that he was not affected by his crack use at the time of the offense and because Dr. Larson and Dr. Szmurlo, the experts hired by Hall, did not report that Pace's crack use affected his mental health at the time of the offense, Hall concluded that evidence of Pace's past crack use would be more prejudicial than beneficial under the circumstances of the defense. Hall concluded that the evidence of crack use would be contrary to his strategic efforts to emphasize with the jury that Pace "had some good qualities and was a human being who should be

24

saved." Our review of the postconviction order reveals that the court made a factual determination based upon the evidence presented that Hall's decision was strategic and that the postconviction court applied the correct rule of law.

Id. at 174.

In sum, the supreme court, on de novo review, concluded that Pace failed to prove that Hall's performance in preparing for or presenting Pace's case in the penalty phase fell below the Strickland performance standard. The court therefore affirmed the circuit court's disposition of the claim at issue along with its denial of the other claims Pace's Rule 3.850 motion had raised. Pace petitioned the United States Supreme Court for writ of certiorari and the Supreme Court denied Pace's petition on January 20, 2004. Pace v. Florida, 540 U.S. 1153, 124 S. Ct. 1155, 157 L. Ed. 2d 1049 (2004).

IV.

On September 28, 2004, Pace filed a timely petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida seeking relief on the same ineffective assistance of counsel claim the supreme court rejected and five other claims of constitutional error as well. On October 1, 2007, the district court denied Pace's petition in full. It rejected the ineffective assistance claim at issue here as follows:

In short, the attorney determined that the possible benefit of presenting testimony regarding Mr. Pace's cocaine use was outweighed by the risk that it would impact the jury negatively. He therefore made a tactical decision not to present evidence of the cocaine use in mitigation. Given the totality of the circumstances, Mr. Pace has not demonstrated that the attorney's representation fell below an objective standard of reasonableness.

Or at least, so a state court could reasonably conclude, as the Florida Supreme Court did. The court's decision was not contrary to, nor an unreasonable application of, clearly established federal law. The court clearly identified *Strickland* and other relevant state and federal cases interpreting *Strickland*, and it applied those decisions to the facts of Mr. Pace's case. There is no case decided by the United States Supreme Court with materially indistinguishable facts that reached a different result. Nor was the Florida Supreme Court's decision based on an unreasonable determination of the facts. . . .

The Florida Supreme Court held that Mr. Pace's penalty phase counsel did not render ineffective assistance by failing adequately to prepare the mental health experts or by relying on their opinions. The court's holding is not an unreasonable application of, nor contrary to, settled federal law, and the determination is not based on an unreasonable determination of the facts.

Pace filed a timely notice of appeal to this court. After he filed the notice, he applied to the district court for a certificate of appealability. The court granted his application on one issue: whether trial counsel rendered ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, for failing to investigate and present evidence of Pace's substance abuse to his mental health experts and thereafter to the jury during the penalty phase of his capital trial.

26

V.

Pace's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996, which establishes a "general framework of substantial deference" for reviewing "every issue that the state courts have decided[.]" Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir. 2005). As discussed before, a federal court may not issue a writ of habeas corpus setting aside a state court's denial of a federal constitutional claim unless the petitioner demonstrates that the state court's decision is flawed for one or both of the reasons listed in 28 U.S.C. § 2254(d). The first reason is that the state court misapplied the relevant holdings of the United States Supreme Court;[18] the second reason is that the state court's findings of fact lack evidentiary support. See Newland v. Hall, 527 F.3d 1162, 1184 (11th Cir. 2008). In assessing the state court's findings of fact, we "presume" those findings are "correct." See id.; 28 U.S.C. § 2254(e)(1). If the petitioner contends that the findings of fact are not correct, he bears the burden of establishing that they are not correct by "clear and convincing

---

[18] It is clear that the relevant Supreme Court precedent for our purposes is Strickland v. Washington, because that decision was handed down prior to the Supreme Court's denial of Pace's petition for a writ of certiorari to review the supreme court's denial of Rule 3.850 relief. See generally Newland, 527 F.3d at 1197-1202.

27

evidence."[19] Id. ("The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Pace has never challenged the supreme court's findings of fact as lacking evidentiary support, either in litigating his petition in the district court or in his brief on appeal.[20] Nor does he challenge the United States Supreme Court precedent the Florida Supreme Court applied in rejecting his ineffective assistance claim. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, clearly controlled the issue in this case and the state court applied it. His argument on appeal therefore boils down to whether the supreme court misapplied Strickland in holding that defense counsel made a reasonable strategic choice in opting to forego additional investigation into Pace's crack cocaine addiction and portraying Pace as a decent human being rather than as a crack cocaine addict.

"Strategic choices made after thorough investigation of law and facts relevant to possible options are virtually unchallengeable." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. That is to say, "[c]ourts conduct a highly deferential

---

[19] If the district court does not hold an evidentiary hearing on the claimant's issues but instead, relies on the state court's findings of fact made following an evidentiary hearing on the claim, the petitioner must rebut the presumption of correctness by pointing to clear and convincing evidence in the record of that evidentiary hearing.

[20] In the supreme court, Pace did not challenge as clearly erroneous the findings of fact the circuit court made in denying his Rule 3.850 motion.

review of counsel's performance and indulge the strong presumption that counsel's performance was reasonable." Stewart, 476 F.3d at 1209 (internal quotation marks omitted).

Here, the supreme court found that defense counsel made a reasonable investigation into Pace's drug abuse. Martin and Hall both questioned Pace regarding his drug abuse and Pace told them that he abused crack cocaine and had been doing so for months preceding the murder. Pace made the same statement to Drs. Larson and Szmurlo. Szmurlo's report to Hall stated that Pace was engaged in "a rather heavy use of cocaine prior to the offense." Hall asked members of Pace's family and friends about his drug abuse; he took the depositions of five of the ten people who gave collateral counsel the affidavits that were submitted to Drs. Crown and Herkov.[21] He took the depositions of those most likely to know about Pace's behavior; they revealed nothing significant about Pace's drug use, though they were asked about it point blank.

Providing an affidavit that contradicts what the affiants previously said under oath is not unknown:

---

[21] Florida affords defendants in criminal cases essentially the same discovery rights litigants in civil cases enjoy. In this case, defense counsel took 11 depositions in addition to the extensive open-file discovery the prosecution provided.

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called. . . . Such affidavits usually prove at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.

Williams v. Head, 185 F.3d 1223, 1236 (11th Cir. 1999) (citations omitted).

Implicit in the supreme court's rejection of Pace's ineffective assistance claim is the notion that Hall went far enough in investigating Pace's crack cocaine addiction. Hall could have deposed all ten, instead of just five, of the witnesses who gave affidavits to collateral counsel. However, "[t]o be effective, a lawyer is not required to pursue every path until it bears fruit or until all hope withers . . . . [A] decision to limit investigation is accorded a strong presumption of reasonableness." Id. at 1236-37 (citations omitted). Given the statements Pace made to defense counsel, the investigator, and Drs. Larson and Szmurlo—that he was not under the influence of crack cocaine or alcohol when he commited the Covington murder—and what the witnesses said on deposition, we agree with the supreme court that it was reasonable for counsel to limit their investigation into Pace's substance abuse addiction. We also agree with the supreme court that "[t]rial counsel cannot be deemed ineffective for failing to provide information to

30

[Drs. Larson and Szmurlo] that the affiants chose not to disclose to counsel when originally questioned."[22]

Moreover, as Hall himself recognized, presenting evidence of a defendant's drug addiction to a jury is often a "two-edged sword": while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence. For example, in Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001), we held that an attorney's strategy to show a "family-friendly side of [defendant], rather than dwelling on the evidence of [his] extensive drug use and drinking with a sociopathic biker crowd" was reasonable because the jury would likely not consider alcohol and drug use to be mitigating. Here, as in Housel, Hall chose to draw upon the sympathy of the jurors by portraying Pace as a good person who helped and cared for his family rather than as a crack cocaine addict with poor hygiene and a paranoid personality while on drugs. The supreme court correctly held that this was a reasonable strategy choice.[23]

---

[22] We agree as well with the supreme court that the testimony of Dr. Herkov and Dr. Crown was unconvincing. The "mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997).

[23] We note in passing that neither collateral counsel nor the attorneys representing Pace in these federal habeas proceedings have criticized Hall for presenting witnesses who described Pace as a loving, caring person who came from a good, supportive family and was a decent human being. Rather, their challenge is that Hall should have called witnesses to inform the jury that Pace was a crack cocaine addict. Hall could have summoned Kenneth Bembo and Barry

31

## VI.

There is no basis in this record to conclude that the Florida Supreme Court's decision denying Pace's claim of ineffective assistance of counsel in the penalty phase of the trial was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. We therefore resolve in the State's favor the issue presented in the certificate of appealability, and the district court's decision denying a writ of habeas corpus is, accordingly,

AFFIRMED.

---

Copeland to establish that Pace needed between $50 to $500 per day to maintain his crack addiction. This would have left it to the jury to speculate as to where Pace, who was unemployed, might have found such funds. If Hall had called those witnesses, we can only imagine, as Hall probably did, how the State would have used the drug addiction evidence in cross-examining Hall's character witnesses and in arguing that the death sentence was the appropriate penalty under the circumstances.