644 So.2d 64 (1994)
Ernest SUGGS, Appellant,
v.
STATE of Florida, Appellee.
No. 80340.
Supreme Court of Florida.
September 1, 1994.
Rehearing Denied October 25, 1994.
*65 Larry D. Simpson of Kitchen, Judkins, Simpson & High, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Ernest Suggs appeals his convictions of first-degree murder, kidnapping, and robbery and his sentences for these offenses, including a sentence of death for the first-degree murder conviction. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution. For the reasons expressed, we affirm Suggs' convictions and sentences.
The record reflects the following facts regarding this case. Pauline Casey, the victim, worked at the Teddy Bear Bar in Walton County. On the evening of August 6, 1990, the bar was found abandoned, the door to the bar was ajar, cash was missing from the bar, and the victim's car, purse, and keys were found at the bar. The victim was missing. Ray Hamilton, the victim's neighbor, told police that he last saw the victim shooting pool with an unidentified customer when he left the bar earlier that night. Based on Hamilton's description of the customer and the customer's vehicle, police issued a BOLO for the customer. Subsequently, a police officer stopped a vehicle after determining that it matched the BOLO description.
The driver of the vehicle was identified as the appellant, Ernest Suggs. Although he was not then under arrest, Suggs allowed the police to search his vehicle and his home. While searching Suggs' home, the police found, in a bathroom sink, approximately $170 cash in wet bills, consisting of a few twenty-, ten-, and five-dollar bills and fifty-five one-dollar bills.
Meanwhile, police obtained an imprint of the tires on Suggs' vehicle and began looking for similar tire tracks on local dirt roads. Similar tire tracks were found on a dirt road located four to five miles from the Teddy Bear Bar. The tracks turned near a power line, and the victim's body was found about twenty to twenty-five feet from the road. The victim had been stabbed twice in the neck and once in the back; the cause of death was loss of blood caused by these stab wounds. After the victim was found, Suggs was arrested for her murder.
In addition to the cash and tire tracks, police obtained the following evidence connecting *66 Suggs to the murder: one of the three known keys to the bar and a beer glass similar to those used at the bar were found in the bay behind Suggs' home; the victim's palm and fingerprints were found in Suggs' vehicle; and a serologist found a bloodstain on Suggs' shirt that matched the victim's blood. Additionally, after his arrest, Suggs told two cellmates that he killed the victim.
In his defense, Suggs contended that he was framed and made the following claims: that he had small bills because his parents had paid him in cash for working on their dock; that the money was wet because he fell in the water while working on the dock; that other vehicles have tires similar to the tires on his vehicle; that the tires on his vehicle leave a specific overlap pattern because of the wear on them and that no such overlap pattern was found at the scene; that the underbrush on his vehicle did not match any brush from the area of the crime scene; that no fibers or hairs from the victim were found in his vehicle; that the fingerprints in his vehicle could have been left at any time before the day of the murder; that the enzyme from the blood stain on his shirt matches not only the victim but also 90% of the population; that the shirt from which the blood was taken was not properly stored and that the stain could come from any bodily fluid; that the tests performed on the blood stain produced inconclusive results, including the fact that the stain could have been a mixed stain of saliva and hamburger; that a news conference was held regarding his arrest twenty-four hours before the bay behind his house was searched, which provided ample time for someone to deposit the key and glass there; and that his two cellmates lied, gave inconsistent testimony, and received reduced sentences because of their testimony. Additionally, Suggs contended that both Ray Hamilton and Steve Casey, the victim's husband, could have committed the murder (with Casey having life insurance as a motive), and that those individuals were being pursued as suspects until his arrest, but as soon as he was arrested, police dropped their investigation of those suspects.
The State countered this defense by showing that the dock on which Suggs was purportedly working contained no new wood; that the tire tracks did in fact match Suggs' vehicle; and that the enzyme from the blood did not come from Suggs.
Suggs was convicted of first-degree murder, kidnapping, and robbery.
At the penalty-phase proceeding, one of Suggs' cellmates testified that Suggs told him he murdered the victim because he did not want to leave a witness. Additionally, the State entered into evidence a book entitled Deal the First Deadly Blow, which they had taken from Suggs' house. The State used this evidence to show that Suggs planned how he would kill the victim. The State also introduced evidence that Suggs was convicted of first-degree murder and attempted murder in 1979 and that he was on parole at the time of the murder in this case. Suggs produced evidence showing that he came from a good family; that he was a normal, happy child; and that he was a very hard worker.
After the penalty proceeding, the jury recommended, by a seven-to-five vote, that Suggs be sentenced to death. The trial court sentenced Suggs to death, finding seven aggravating circumstances[1] and three mitigating circumstances.[2]

*67 Guilt Phase

As his first issue on appeal, Suggs contends that a new trial is warranted because the trial judge erred in permitting a judge to testify on behalf of the State without first conducting a Richardson[3] hearing. This claim arises from the following facts. Wally Byars, one of the two cellmates who testified against Suggs, was serving a three-year sentence but was temporarily released from jail during that sentence. During that release, Byars was arrested after getting into a dispute with his wife. To minimize the impact Byars' arrest would have on his credibility as a witness, the State announced that it would call Acting Circuit Judge Lewis R. Lindsey to testify that he made the decision to release Byars. The State announced Judge Lindsey as a witness after the jury was sworn even though Judge Lindsey had not been listed as a potential witness on the State's witness list. After learning that Judge Lindsey would be called as a witness, Suggs objected and asked for a Richardson hearing because the failure to list Judge Lindsey as a witness constituted a discovery violation. Suggs contends that, because the trial judge failed to conduct a Richardson hearing before allowing Judge Lindsey to testify, a new trial is warranted.
The failure to conduct a Richardson hearing in the face of a discovery violation is per se reversible error once the violation has been brought to the court's attention and a Richardson hearing has been requested. Smith v. State, 500 So.2d 125 (Fla. 1986). The mandates of Richardson apply to rebuttal witnesses as well as to witnesses called on direct examination. Elledge v. State, 613 So.2d 434 (Fla. 1993); Kilpatrick v. State, 376 So.2d 386 (Fla. 1979). Consequently, under the facts of this case, we must determine whether a discovery violation occurred, whether a Richardson hearing was requested, and, if so, whether the trial judge made an inquiry sufficient to satisfy the dictates of Richardson.
The record reflects that, upon the State's announcement that it might call Judge Lindsey as a rebuttal witness, Suggs' counsel objected and asked for a Richardson hearing. At that point, the trial judge acknowledged that, if the State were to call Judge Lindsey as a witness, "clearly [Suggs] would be entitled to a Richardson hearing." Six days later, the State announced that it would be calling Judge Lindsey as a witness. Suggs' counsel again objected, arguing that the judge's testimony was not probative and was highly prejudicial. At that time, however, Suggs' counsel stated that the admission of Judge Lindsey's irrelevant testimony could not be cured by a Richardson hearing. The trial judge then proceeded to hear a significant amount of argument by both the State and Suggs regarding the relevancy of Judge Lindsey's testimony. After reviewing the position of both sides, the trial judge stated:
[G]iven the disparity between the State and the defense as it relates to the circumstances surrounding that medical release, when it occurred, why it occurred, how it occurred, what the conditions of that release were, and the significance that that issue obviously raises for both the State and the defense, I know of no other way to deal with it other than to allow Judge Lindsey to testify on that point.
If counsel can in the meantime come up with some creative way of resolving the problem I am open to hearing it. But at this point there has not been one that I have been able to suggest or either counsel suggest short of going straight to the horse's mouth to find out exactly what happened when and the conditions, etcetera.
Thereafter, Suggs never renewed his request for a Richardson hearing.
We find that the State committed a discovery violation when it stated its intention to call Judge Lindsey to testify because Judge Lindsey was not listed as a witness before trial. Brazell v. State, 570 So.2d 919 (Fla. 1990). Additionally, we find that Suggs objected to the admission of Judge Lindsey's testimony and simultaneously requested a Richardson hearing. Thus, the first two prongs of our inquiry were met, i.e., a discovery violation occurred and a Richardson *68 hearing was requested. We find, however, that we need not reach the third issue of whether an adequate Richardson hearing was conducted by the trial judge, because, under the circumstances of this case, we find that Suggs' counsel waived his request for such a hearing by stating that a Richardson hearing would not cure the damage of admitting Judge Lindsey's testimony. Clearly, the trial judge was aware that Suggs was entitled to a Richardson hearing. After Suggs' counsel made the statement that a Richardson hearing could not cure the discovery error, the trial judge heard arguments as to the relevancy of Judge Lindsey's testimony but she did not hear arguments as to the prejudicial nature of the discovery error. See Smith (Richardson inquiry consists of a determination as to whether the discovery violation prevented a party from properly preparing for trial). Moreover, Suggs' counsel had ample opportunity to renew his request for a Richardson hearing but failed to do so. On these facts, we determine that Suggs waived his Richardson hearing request, and we deny this claim.
Suggs next contends that the trial judge erred by denying Suggs' motion to suppress the evidence found at his home, claiming that his initial detention by police was illegal and that the consent form he signed agreeing to allow the law enforcement officers to search his home was improperly obtained. We disagree. At the time Suggs was stopped, no one even knew the victim was dead; the officers were looking for Suggs simply to determine if he knew the victim's whereabouts. Additionally, Suggs was legitimately stopped by the officer because he was speeding. Further, Suggs voluntarily agreed to accompany the officer to the station, even going so far as to show another officer how to drive his vehicle. Finally, once at the station, Suggs not only voluntarily agreed to allow officers to search his home  he did so only after reaching an agreement with the officers not to charge him with the illegal possession of weapons that he kept at his home.
In his third claim, Suggs argues that the trial judge erroneously denied his motion for mistrial. During opening arguments, the prosecutor stated that Taylor, a cellmate of Suggs', would tell the jury that "[Taylor is] from Alabama. He's been in prison up there. He and the Defendant  he knew the Defendant." At the close of the prosecutor's argument, Suggs moved for a mistrial based on the fact that the jury could infer from this statement that Suggs had been in prison with Taylor. Before ruling, the trial judge reviewed the transcript and listened to the statement on the court reporter's tape, after which the trial judge found no misrepresentation by the State. Later, however, the trial judge determined that it was a "close call" as to whether a reasonable person might infer that Suggs had been in prison with Taylor. Consequently, Suggs and the prosecutor reached an agreement as to the following statement that the prosecutor subsequently read to the jury:
In order to avoid any possible misunderstanding that may have been created yesterday, I would like to make a brief statement: I did not intend to imply that Mr. Taylor met Mr. Suggs in prison in Alabama. The evidence will show the first time they met was in the Walton County Jail after Mr. Suggs' arrest in this case.
Based on this curative statement and the fact that Taylor and Suggs never served together in prison, we find that the prosecutor's curative statement was sufficient to remove any impression created in the minds of the jurors that Suggs may have served time in prison with Taylor in Alabama.
Suggs also points to a number of arguments and tactics of the prosecutor which he asserts deprived him of a fair trial. We note that other than the comment at issue in the preceding claim, none of the prosecutor's arguments or tactics were objected to at trial. Consequently, this claim has not been preserved for appeal. Moreover, having reviewed the prosecutor's conduct within the context of the entire record, we find this claim to be without merit.
In his fifth claim, Suggs asserts that the evidence was insufficient to support Suggs' conviction for kidnapping because no evidence exists to support the charge that he *69 forcibly required the victim to leave the bar. We disagree. As stated by the trial judge:
The evidence showed that the victim, a reliable worker and sole employee at the time, was discovered missing from the bar; the bar had been left open with lights on; the victim's purse and keys were beside the unsecured cash register and her car was in the parking lot. Money had been taken from the cash register. [The victim's] body, with multiple stab wounds, was later found in high brush in a wooded area.
Further, Byars testified at trial that Suggs told him he took the victim out of the bar at knife point. Based on this evidence, we find that the record supports Suggs' conviction for kidnapping.
In his final guilt-phase argument, Suggs contends that the trial judge erred in denying Suggs' motion to preclude the in-court identification of Suggs by Ray Hamilton. Again, we disagree. After Suggs was taken to the police station, the police brought Ray Hamilton to the station after they picked him up from his home in the middle of the night. At the station, police showed him a single Polaroid photograph of Suggs "while it was developing" and asked him whether the person in the photograph was the person who was with the victim when Hamilton left the bar. Hamilton positively identified the photograph. Suggs moved to suppress this identification given the suggestive nature of the identification. In ruling on Suggs' motion, the trial judge noted that this procedure was indeed suggestive. In denying the motion, however, she determined that Hamilton's identification was still reliable given that Hamilton spent thirty-five minutes in the presence of Suggs at the bar; that Hamilton gave a detailed and accurate description of Suggs before being shown the photograph; that he had the opportunity to closely examine Suggs at the bar; that he was shown the photograph less than twelve hours after he saw Suggs; and that he was not told that this was the suspect. We find that the trial judge correctly denied Suggs' motion.

Penalty Phase
As to his sentence of death, Suggs first claims that the trial judge erred in admitting into evidence the book entitled Deal the First Deadly Blow. According to Suggs, the book was irrelevant and inflammatory and was entered into evidence at the penalty proceeding even though no evidence was produced to connect Suggs with the book. Further, the prosecutor emphasized that the type of wounds on an individual pictured in the book matched the wounds on the victim in this case. The trial judge also relied on this evidence to show that the murder was cold, calculated, and premeditated. Suggs argues that he is entitled to a new sentencing proceeding because this evidence was erroneously considered by the judge and jury.
The record reflects that the trial judge found the book to be relevant because the illustration in the book reflected wounds to a victim that were very similar to the stab wounds inflicted on the victim's body in this case. Nevertheless, the judge stated that she would not allow the book into evidence without a proper foundation showing that the book belonged to Suggs. Consequently, the State put on the testimony of two officers to show that the book likely belonged to Suggs because it was found in the house where he lived and was found near a notebook which had Suggs' name in it and which contained diagrams of knives and notes on how to commit a robbery. The trial judge determined that the book was admissible. To help minimize the impact of the book, however, the trial judge asked defense counsel if he would prefer that only the cover page of the book and the single picture at issue be shown to the jury. Defense counsel declined this offer, opting instead for the introduction of the entire book. Under these circumstances, we find that the book was properly admitted during the sentencing proceeding.
Finally, Suggs argues that the trial judge erred in a number of areas by allowing the jury to consider certain evidence in aggravation and in instructing the jury on certain aggravating factors. Specifically, Suggs contends that: (1) the prosecutor improperly elicited testimony during the penalty phase regarding witness elimination and nonviolent, uncharged offenses that Suggs had either *70 committed or planned to commit; (2) insufficient evidence existed to establish that Suggs set out to kill the victim to eliminate a witness; (3) the jury instruction on heinous, atrocious, or cruel is invalid under Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); (4) the murder was not heinous, atrocious, or cruel because the victim had only two knife wounds of any significance and because it is uncertain whether the victim was in any pain or how long she lived after the attack; (5) the murder was not cold, calculated, and premeditated; and (6) the trial court improperly doubled aggravators by finding that Suggs committed the murder "to avoid detection" and "to avoid arrest." We find all of these claims to be without merit and note that only a few deserve further discussion. No objection was made by Suggs to the solicitation of testimony during the penalty phase, and the arguments regarding that testimony are procedurally barred. Likewise, the Espinosa claim was not preserved for review. Notably, the instruction given is not the invalid instruction at issue in Espinosa. Additionally, no objection was made to the giving of the instruction on the cold, calculated, and premeditated aggravating circumstance. Finally, we find that the trial judge properly found that the murder was both heinous, atrocious, or cruel and cold, calculated, and premeditated. As the trial judge noted:
Following the robbery, [the victim] was taken from the bar to a secluded area. The Defendant then repeatedly stabbed the victim. She lived several minutes, not because of the Defendant's lack of dispatch and expertise, but because the tenacity for life of the human body. The victim was clearly subjected to agony over the prospect that her death was soon to occur. [The victim] bled to death after the Defendant stabbed her several times in the neck and chest; either one of two of the wounds inflicted would alone have caused her death. There was one wound at the base and rear of the neck that severed her spinal column and another stab cut a main artery. As is evident from the autopsy pictures, the Court agrees with the Defendant's statement to his cellmates that he nearly cut [the victim's] head off. In addition to the fatal wounds, the Defendant stabbed the victim several other times including one cut across the front of her neck. None of the wounds caused instant death and [the victim] would have felt the pain of the other stabs as she bled to death, surely terrified as her death approached. The Defendant acted with utter indifference to the suffering of this victim. The murder was accompanied by such additional acts which sets this crime apart from normal capital felonies. It was a conscienceless, pitiless crime which was unnecessarily torturous to the victim. This aggravating fact, that the capital felony was especially heinous, atrocious, or cruel has been proved beyond a reasonable doubt.
... .
The Defendant was the only customer in this rural bar at the time he robbed and kidnapped [the victim]. He drove the victim to a two-rut dirt road in a wooded area of Walton county. There he stabbed her several times in the neck and back. At least two of these wounds were from the rear and are remarkably similar to wounds graphically demonstrated by photographs on page 99 in the book Deal the First Deadly Blow, recovered from the Defendant's home. These type of wounds were particularly expedient, giving their goal of death, and reflect the calculating mind of the Defendant. The entire criminal episode reflects the Defendant's careful plan to rob [the victim], kidnap her, kill her, and hide her body, all with the aim of avoiding detection. Mr. Suggs was particularly careful because, as he explained to his cellmates, he was not going to be stupid this time.
Accordingly, we affirm Suggs' convictions of first-degree murder, kidnapping, and robbery and his respective sentences, including his sentence of death for the first-degree murder conviction.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN and HARDING, JJ., concur.
NOTES
[1] (1) A capital felony was committed by Suggs while under sentence of imprisonment; (2) Suggs was previously convicted of another capital felony and a felony involving the use or threat of violence to the person; (3) the crime for which Suggs is to be sentenced was committed while he was engaged in the commission of the crime of kidnapping; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (5) the capital felony was committed for pecuniary gain; (6) the capital felony was especially heinous, atrocious, or cruel; (7) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[2] (1) The capacity of Suggs to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (he had been drinking at the time of the incident); (2) Suggs' family background (he came from a good family); and (3) Suggs' employment background (he was a hard worker).
[3] Richardson v. State, 246 So.2d 771 (Fla. 1971).