[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 09-12718

———————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-00111-CV-RH

ERNEST D. SUGGS,

Petitioner-Appellant,

versus

WALTER A. MCNEIL,

Respondent-Appellee.

———————————————

Appeal from the United States District Court
for the Northern District of Florida

———————————————

**(June 24, 2010)**

Before BIRCH, BLACK and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This appeal from the denial of a petition for a writ of habeas corpus presents the question whether the attorneys who represented Ernest Suggs, a Florida prisoner sentenced to death, deprived Suggs of effective assistance by failing to investigate and present a defense of mental health mitigation for the penalty phase of his trial. In 1992, a jury found Suggs guilty of robbery, kidnapping, and murder. The state proved that Suggs in 1990 kidnapped Pauline Casey, who was working alone at the Teddy Bear Bar in Walton County, Florida; Suggs drove Casey several miles from the bar, and stabbed her multiple times in the neck and back, nearly decapitating her; and Suggs stole about $200. During the penalty phase, Suggs's attorneys presented evidence of his good character, but the jury recommended, by a seven-to-five vote, a sentence of death, which the trial court accepted. In a collateral attack of his conviction and sentence in state court, Suggs argued that his attorneys should have investigated and presented evidence of his "intellectual inefficiency." The Florida Supreme Court ruled that the attorneys' failure to investigate and present a defense about Suggs's mental health did not undermine confidence in the result of the penalty phase. Because we conclude that the decision of the Florida Supreme Court that Suggs failed to prove prejudice under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), was neither contrary to nor an unreasonable application of clearly established federal law, we affirm.

# I. BACKGROUND

We divide our discussion of the background in two parts. First, we describe Suggs's state trial and conviction. Second, we describe Suggs's effort to vacate his conviction and sentence in state court and his petition for habeas relief in federal court.

## A. State Trial and Conviction

On the night of August 6, 1990, patrons found the Teddy Bear Bar in Walton County, Florida, abandoned. Suggs v. State (Suggs I), 644 So. 2d 64, 65 (Fla. 1994). The door to the bar was open, cash was missing from the register, and Pauline Casey, who had been working alone that night, was missing. Id. Casey's car, purse, and keys were all at the bar. Id.

Casey's neighbor, Ray Hamilton, who had been at the bar that night, informed police that, when he left, he saw Casey playing pool with a patron. Id. The police located that patron, Ernest Suggs, and he consented to a search of his car and home. Id. In Suggs's bathroom sink, the police discovered nearly $170, including 50 one-dollar bills. Id. The police also took an imprint of a tire on Suggs's car and began searching local dirt roads for tire tracks. Id.

The police located tire tracks that matched the imprint from Suggs's tire on a dirt road about four or five miles from the bar. Id. Investigators followed the tracks until the tracks left the road and then began searching the roadside; they

3

discovered Casey's body about 25 feet from the road.  Id.  Casey had been stabbed twice in the neck and once in the back.  Id.  According to the autopsy report, the "left posterior neck wound . . . was wide and deep—incising all posterior neck muscles, separating vertebras 2 and 3, and cutting . . . the cervical spinal cord at that level."  The report also stated that Casey died from blood loss as a result of her wounds.  As the trial court later found at sentencing, "The victim was clearly subjected to agony over the prospect that her death was soon to occur. . . . None of the wounds caused instant death and Mrs. Casey would have felt the pain of the other stabs as she bled to death, surely terrified as her death approached."

The investigation tied Suggs to Casey's murder.  In the bay behind Suggs's house, the police located one of the three known keys to the bar from which Casey was abducted.  Id. at 65–66.  In that same bay, the police located a beer glass that was similar to the beer glasses used at the bar.  Id. at 66.  The police also discovered prints from Casey's palm and fingers in Suggs's car.  Id.  A serologist found a bloodstain on Suggs's shirt that matched Casey's blood.  Id.  Moreover, two cellmates testified that Suggs confessed to them that he had murdered Casey. Id.  After a trial, at which Suggs was represented by Robert Kimmel and Donald Stewart, a jury convicted Suggs of robbery, kidnapping, and first-degree murder. Id.

During the penalty phase, the state sought the death penalty and elicited

4

testimony from three witnesses to establish aggravation. One witness testified about Suggs's motive. Another testified about Suggs's planning of the crime. A third witness testified about Suggs's criminal history.

The state called Jim Taylor to testify that Suggs had murdered Casey because he did not want to leave a witness to his crimes. Taylor, who shared a cell with Suggs, testified that Suggs told him that he had once been convicted in Alabama of murder and attempted murder, but that he expected to escape conviction of Casey's murder. According to Taylor, Suggs "said the case in Alabama he was stupid but this case he was not because he didn't leave a damn witness, 'I almost takened [sic] her damn head off.'"

Investigator Steve Sunday testified about evidence of premeditation. Sunday testified that police had discovered a book, Deal the First Deadly Blow, on a bookshelf in Suggs's house that contained other books that belonged to Suggs. The court admitted the book, which contained illustrations and instructions about inflicting fatal blade wounds. During its opening statement during the penalty phase, the state explained to the jury that the "book describes how to deal the first deadly blow. . . . [Y]ou will see the similarities in those photographs to the injuries that . . . were inflicted upon Pauline Denise Casey." Kimmel cross examined Sunday and suggested that the book belonged to Suggs's father, who shared the house with Suggs and had retired from the military, because the book, according to

5

its introduction, is "a guide for instructors to use to prepare themselves to conduct training of soldiers in the art of instinctive rifle bayonet fighting."

The state called probation and parole officer Danny Myrick to testify that Suggs had been previously convicted of first-degree murder and assault with intent to murder and was paroled when he murdered Casey. Myrick testified that Suggs had been convicted in Alabama of murder in February 1979 and assault in June 1979. Suggs received a life sentence, but he was paroled in June 1989.

The state also attempted unsuccessfully to introduce a psychological evaluation of Suggs to prove that he could comprehend the criminality of his conduct. The report had been prepared by Dr. James Larson, a psychologist who examined Suggs before trial at the request of a public defender who had first represented Suggs. The public defender asked Dr. Larson to "conduct[] a psychological evaluation" of Suggs in September and October 1990 and in February 1991. In preparing his report, Dr. Larson administered psychological tests, interviewed Suggs, reviewed a prior statement from Suggs, and reviewed selected legal records. The state hoped that this evaluation would counter evidence that Suggs murdered Casey while suffering under extreme mental or emotional disturbance due to, as the trial court described it, "an extensive period of drinking" that preceded the murder.

Stewart objected to the introduction of the report. Stewart argued that the

6

report "reflect[ed] a conflict between Mr. Suggs and his public defender." Suggs apparently did not trust his public defender and, in turn, did not trust the psychologist whom the public defender had secured to evaluate him. Stewart also argued that the court should not admit the report because Dr. Larson was not available for cross examination. The court reviewed the report and stated on the record that "Dr. Larson did not conclude that he was unable to reach an opinion because of either the problems between Mr. Suggs and his attorney or because of the marginal involvement of Mr. Suggs" in the evaluation. Nevertheless, the court decided that, "in an abundance of precaution," it would not admit the report.

Suggs presented a mitigation defense that focused on his good character. Suggs called Barbara Tucker, a friend of his family for nearly 32 years, who testified that Suggs had a well-respected, hardworking, and successful father, and a brother who suffered from "severe scoliosis" and a "degree of mental retardation." Tucker testified that Suggs was a "very hard worker" and that, when he returned home from prison in 1989, he helped around his family's house. She also explained that after his release, Suggs had a "good relationship" with his parents. Rhonda Carlson, whose father employed Suggs as a laborer, testified that she had known Suggs for about 15 years and that Suggs was "a dependable worker" who reported for work "[e]very day it wasn't raining." She testified that Suggs and his family got along "[r]eal good" and that he was close with his younger brother.

7

Suggs's mother also testified about her family, including her "two sons, wh[om] [she] love[d] very much." She explained that Suggs "was a very happy child. He was normal. We had very few problems. Just the normal things." She also testified about Suggs's involvement with the Boy Scouts and church. She explained that Suggs had earned a general equivalency diploma and completed a 3,000-hour course at the Colorado School of Trades for which he earned a gunsmithing certificate. Suggs also introduced letters from Ruth Raymond, a neighbor of the Suggs family, and O.J. Bailey, a "lifelong friend of [Suggs's] family." Suggs's attorneys asked the jury to consider this mitigating evidence, as well as the fact that Suggs would likely receive three consecutive life sentences for his crimes, in deciding whether to recommend a sentence of death.

After the jury recommended a sentence of death by a vote of seven to five, the trial court accepted the recommendation and found seven facts in aggravation. Suggs v. State (Suggs II), 923 So. 2d 419, 423 n.1 (Fla. 2005). The court found that Suggs murdered Casey while under a sentence of imprisonment, Suggs had a prior conviction for a capital felony and a felony involving the use or threat of violence, and Suggs committed the murder during the course of a kidnapping. Id. Based on the statements that Suggs made to his cellmate, Jim Taylor, after Suggs had been arrested, the court also found that "[t]he dominant or only motivation for this killing was the elimination of the only witness." The court also found that

8

Suggs had committed the murder for pecuniary gain because the evidence showed that he had robbed Casey of $207. The court found that the murder was especially heinous, atrocious, or cruel because "Casey was taken from the bar to a secluded area" where Suggs "repeatedly stabbed" her. The court stated, "The victim was clearly subjected to agony over the prospect that her death was soon to occur. . . . None of the wounds caused instant death and Mrs. Casey would have felt the pain of the other stabs as she bled to death, surely terrified as her death approached." The court also found that Suggs committed the murder in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Id. It found that the several knife wounds that Suggs inflicted "were from the rear and are remarkably similar to wounds graphically demonstrated by photographs on page 99 in the book Deal the First Deadly Blow, recovered from the defendant's home." The court found that the "wounds were particularly expedient, given their goal of death, and reflect the calculating mind of the defendant." Indeed, the court found, the "entire criminal episode reflects the defendant's careful plan to rob Mrs. Casey, kidnap her, kill her and hide her body, all with the aim of avoiding detection."

The court found three facts in mitigation. Id. at 423 n.2. It found that Suggs's capacity to appreciate the criminality of his conduct or to act in accordance with the law was substantially impaired because "he had drank one-half

a case of beer and had quite a few drinks at several bars in the ten to twelve hours" before the police stopped him on the night of the murder. It also found that Suggs came from a good family, and that Suggs's employment history proved that he was a hard worker.

The court refused to find several statutory mitigating factors. It refused to consider Suggs's age because Suggs was 35 when the murder occurred and his "emotional age [was] consistent with his actual age." The court stated that it had "observed the demeanor of the defendant as he interacted with counsel through several pretrial matters spanning almost two years" and "considered the manner in which the defendant communicated with law enforcement and his testimony at the motion to suppress" before trial. The court concluded, Suggs "presented himself as articulate, intelligent and appropriate in his behavior. There is no evidence that the defendant is retarded or that his I.Q. is not normal." The court also stated that, although Suggs had been drinking heavily at the time of the murder, there was "no testimony regarding a history of abuse or dependency upon alcohol or other drugs by this defendant." Suggs appealed his conviction and sentence, and the Florida Supreme Court affirmed. Suggs I, 644 So. 2d 64.

*B. Collateral Proceedings in State and Federal Court*

Suggs filed a motion to vacate his conviction and sentence under Florida Rule of Criminal Procedure 3.850. Suggs II, 923 So. 2d at 425. Only one of the

10

claims in his motion is relevant to this appeal: Suggs argued that Kimmel and Stewart were constitutionally ineffective during the penalty phase of his trial. Suggs argued that they should have had him evaluated by a mental health expert and should have called a mental health expert at trial. Id. at 434. He also argued that they should have obtained and presented his school and medical records and evidence of his good behavior while incarcerated for his first murder conviction. Id. The trial court held an evidentiary hearing at which Suggs developed these arguments. Id. at 425.

Suggs argued that Kimmel and Stewart unreasonably failed to investigate his mental health by collecting records and arranging for an examination by a neuropsychologist. Suggs relied principally on Dr. Larson's report and argued that Kimmel and Stewart had especially strong reasons to think that they should have gathered his records and subjected him to psychological testing. Suggs highlighted Dr. Larson's statement that the report was a "preliminary evaluation as I have not yet received [Suggs's] school records, . . . relevant medical records and psychiatric records from previous periods of incarceration." Dr. Larson also stated that "there may be non-statutory mitigating factors that may include neuropsychological impairment as well as chaotic childhood factors, and other developmental factors [that Suggs] is unwilling or unable to discuss." "For those reasons" Dr. Larson recommended consulting Suggs's school records; medical records; and any

11

medical, psychological, and psychiatric records from Suggs's previous incarceration in order to complete "a thorough assessment of non-statutory mitigating factors." Suggs argued that, in the light of this report, his attorneys were ineffective for failing to gather his school, prison, and medical records, and failing to further investigate his background and mental health. Id. at 434.

Dr. Barry Crown, a neuropsychologist, testified about the evidence that Suggs contended Kimmel and Stewart should have secured. Dr. Crown testified that he had evaluated Suggs in January 1997. He testified that Suggs does not suffer from "a major mental psychotic disorder" "[o]ther than . . . depression." According to Dr. Crown, at the time of testing, Suggs had a "flat affect" and "appeared depressed, morose, erratically moving, seeming to prefer a simple repetitive and dependent life pattern." Dr. Crown also testified that "[i]n terms of intellectual functioning [Suggs] is functioning within the normal limits, meaning that his IQ is at about the 50th percentile." Dr. Crown testified that, although "in terms of his stored information [Suggs is] about average," "in a sense Mr. Suggs can't use the brains that he's got. . . . It's in there but he can't get it out." Dr. Crown administered the Right Hand Indiana Aphasia Screening Test and determined that Suggs "had a mild impairment, particularly in constructional ability, being able to relate what he had seen to hand movements and to construct some simple geometric figures based on eye-hand coordination identification and

12

instruction." Dr. Crown also administered the test of Simple Concentration, Attention, and Mental Flexibility, which measures the "ability to move smoothly from one item to another," and found that Suggs "scored in the dysfunctional range." Suggs also scored in the bottom quartile on the Category Test, which "require[s] someone to learn new problem solving strategies and . . . rapidly apply them in new situations."

Dr. Crown testified that "in terms of processing information, . . . and using information in a problem solving manner and engaging in abstract problem solving," Suggs, who was 42 at the time of testing, was functioning at the level of a 14-year-old. According to Dr. Crown, "in terms of auditory processing, which is listening while distractions are going on," Suggs functioned at the level of a 78-year-old. Dr. Crown opined that Suggs has a "significant neuropsychological deficit and significant neuropsychological impairments, particularly in the functional areas of language based critical thinking and auditory selective attention. This pattern is, indeed, indicative of brain damage, organic brain damage." Dr. Crown also opined that Suggs likely had difficulty "understanding the long term consequences of [his] immediate behavior, which really means understanding the intentions of [his] acts rather than just carrying them out."

Dr. Crown also testified that Suggs's "problems have an early origin rather than a late origin." He testified that Suggs failed the fourth grade and that this is

13

"an important point in terms of education . . . [and] an important point in terms of functioning." He explained that "it's in the fourth grade that we make that shift from group efforts and group activities to the beginnings of language based critical thinking." And it is "language based critical thinking that Mr. Suggs falls down on." Dr. Crown testified that the fact that Suggs failed fourth grade "supports the notion that Mr. Suggs' problems have an early origin rather than a late origin, although there may be a late aggravator."

Dr. Crown explained that abuse of drugs and alcohol can exacerbate an organic condition like Suggs's. He testified, "If you have an underlying condition, a smaller amount of substance or even a smaller amount of stress or confusion will exacerbate the situation, make it worse, make your functioning level lower than it might be in a calmer situation." Dr. Crown clarified that Suggs's organic condition is "not a functional occurrence that's based on having too much to drink[;] . . . [i]t's an underlying organic condition, meaning that the engine just doesn't work." He explained that with "an underlying organic condition - - first, a smaller amount of substance will have a greater effect. Secondarily, you will still be left with the same underlying condition once the substance has dissipated."

On cross examination, the state elicited testimony about the limits of Dr. Crown's conclusions. Dr. Crown conceded that Suggs's intellectual inefficiency would not prevent him from understanding "his need to dispose of evidence if he

14

were involved in [a] crime." Dr. Crown restated his diagnosis that Suggs "was mildly impaired" and clarified that the mild impairment "would be the lowest level, which would mean that a person with that label would still be functional, certainly wouldn't require attendant care, wouldn't require direction." Dr. Crown acknowledged that Suggs had earned a general equivalency degree and a gunsmithing certification. Dr. Crown also agreed that Suggs "can, in fact, use his brain," but, he reiterated, "not in an efficient manner."

The parties also presented evidence of Suggs's drug and alcohol abuse. Dr. Crown testified that Suggs told him that he "had historically consumed alcohol and smoked marijuana." Moreover, "He also told me that he had engaged in huffing, which is the inhalation of toxic fumes, toxic substances such as from glues, adhesives, gasoline." Suggs's statements to Dr. Crown are consistent with statements in Dr. Larson's report. Although when Dr. Larson interviewed him Suggs "disclaimed major substance abuse" since he had been released from prison, Suggs "did report averaging three or four beers a day" and he "reported occasionally having 'a joint' (marijuana)."

Suggs's academic records suggested that he was an average student. Until the fourth grade, Suggs earned mostly C grades, although he earned D grades in language arts and reading during the third grade. Suggs's marks at the Riverside Military Academy, which he attended from 1969 to 1973 (he was 14 years old

15

when he started), are less impressive, but not entirely negative. Suggs earned mostly failing marks and appears to have repeated the ninth grade more than once, but he did earn several C marks and at least two grades (in world geography and pre-algebra) that Riverside designated as "college recommending." His extracurricular record from his time at Riverside shows him to have been an engaged member of the school community. Notations under "outstanding activities, honors, awards" state that Suggs was a member of the rifle team from 1971 to 1973 and earned an "expert rifle badge" during his final year of school. Suggs withdrew from Riverside without graduating in May 1973. During its examination of Kimmel, the state undermined Dr. Crown's reliance on Suggs's having failed the fourth grade as evidence of Suggs's deficiency in "language based critical thinking" by eliciting testimony that Suggs told Dr. Larson that he had failed the fourth grade because his family relocated to Jacksonville.

Dr. Larson's report contained findings unfavorable to Suggs's argument about his mental health. According to Dr. Larson's report, Suggs "reported that his mood was somewhat depressed." Dr. Larson reported that he "felt [this] was understandable given [Suggs's] current situation" of incarceration. This evidence is consistent with Dr. Crown's later observation of Suggs's moroseness and flat affect, but, unlike Dr. Crown, Dr. Larson found "depression . . . contraindicated." Moreover, unlike Dr. Crown, Dr. Larson reported that he administered the

16

Minnesota Multiphasic Personality Inventory and found that Suggs profiled as an individual with "antisocial tendencies." Dr. Larson was "reluctant to offer a more definitive interpretation" of Suggs's personality because Suggs was suffering from an ear infection during his interview. Dr. Larson also reported that Suggs did not cooperate in much of the evaluation and opined that Suggs's "lack of cooperation with this evaluation . . . [is] reflective of a personality disorder and also may very well reflect the Defendant's attempts to 'muddy the waters' in a way he feels may be helpful to him in a possible appeal process." Dr. Larson also reported that Suggs "had unimpaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of" Casey's murder.

Stewart testified at the evidentiary hearing that he had not investigated more of Suggs's background and mental health because he knew Suggs and his family: "I've known [Suggs's father] since I started practicing law . . . and I knew his children when they were growing up; his wife, Loretta, so I knew a good bit about the background of this individual" and "that had something to do with the way I handled that particular part of the penalty phase." He elaborated, "I knew [Suggs] had difficulty in school, I knew he had gone off to a military academy, I knew he'd had some behavioral problems, those kinds of things, in the time that he was growing up." Stewart also explained the decision not to present the testimony of a neuropsychologist at trial; Stewart testified that Suggs's history of behavioral

problems "was one of the reasons I was concerned about a neuropsychologist." He further testified, "[I]f I had known or had some indication that [organic brain damage] was present . . . I would have done something about it."

Kimmel's testimony reflected his better memory of the decisions that Suggs challenged. With respect to the records that he and Stewart had not gathered, Kimmel testified, "I fully believe that none of these records were available or Donald Stewart would have gotten them. . . . [M]y belief is he tried to get all that stuff and it wasn't available or was very damaging." He added, "We could have told the jury that [Suggs] was bad enough to be sent to military school and show them the military school records . . . [but] I don't think that would have been a good idea." Kimmel also addressed the decision not to gather or present Suggs's prison records. He explained that he and Stewart did not "want to do anything to emphasize, to keep reminding [the jury] that oh, yeah, he did a murder before and he got out . . . . We weren't going to touch anything that talked about him being an inmate." He acknowledged that the state had introduced evidence of Suggs's prior incarceration, but explained that "I can avoid throwing gasoline on the fire by continuing to keep talking about his prior incarceration." Regarding the failure to present the testimony of a neuropsychologist, Kimmel testified, "[Stewart] knew the family and knew the history and knew that we didn't want a psychologist knowing just how bad [Suggs] had been because it was going - - if you present that

18

to the jury, you can't present pieces of the puzzle without them getting all of it." Kimmel added, "[Y]ou can do a capital phase without investigators, psychologists. You can do the sentencing phase without those things and do it successfully. I've done it."

The trial court denied relief on all claims, and the Florida Supreme Court affirmed. With respect to Kimmel and Stewart's failure to investigate Suggs's background, the Florida Supreme Court "agree[d] with Suggs that defense counsel should have obtained the school records, medical records, and prison records so that counsel could make informed decisions as to how to represent Suggs." Id. at 435. The court explained, "Stewart's personal familiarity with the Suggs family did not obviate counsel's duty to obtain the records." Id. But the court "conclude[d] that Suggs was not prejudiced by the ineffectiveness in this regard." Id. at 436. The court explained that it had conducted "a review of the records which were obtained and presented at the postconviction evidentiary hearing" and concluded that "some of the records contained information, such as the prior murder and military school attendance, that was potentially damaging." Id. at 435–36. The court further explained, "Suggs failed to demonstrate how the records would have benefitted him in the penalty phase." Id. at 436. The Florida Supreme Court also ruled that the failure to subject Suggs to further psychological testing was not prejudicial. The court held that, in the light of Suggs's "average IQ

19

level and [evidence] that Suggs did not suffer from any major psychiatric disorder, the failure to obtain additional psychological evaluations at the time of the penalty phase or the failure to present expert mental health testimony has not been demonstrated to have been prejudicial to Suggs." Id. at 435. The court concluded, "We have evaluated the penalty phase . . . as a whole, and we conclude that our confidence in the outcome is not undermined." Id. at 436. The Florida Supreme Court explained, "This was a brutal murder in which the trial court found five aggravators to exist, including a prior murder and the weighty aggravators of heinous, atrocious, or cruel (HAC) and cold, calculated, and premeditated (CCP)." Id. The court also rejected Suggs's heavy reliance on Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003), by observing that "Wiggins is consistent with Strickland in requiring a demonstration of prejudice as a basis for relief." Suggs II, 923 So. 2d at 436.

In June 2006, Suggs filed a petition for a writ of habeas corpus in the district court. He raised numerous claims, and the district court rejected them all. The district court then granted Suggs a certificate of appealability on the question whether Kimmel and Stewart were constitutionally ineffective during the penalty phase for failing to investigate and present a mental health mitigation defense.

## II. STANDARD OF REVIEW

Because the Florida Supreme Court adjudicated Suggs's claim on the merits,

20

we may, consistent with the Antiterrorism and Effective Death Penalty Act of 1996, grant relief only if the decision of the court was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Rutherford v. Crosby, 385 F.3d 1300, 1306 (11th Cir. 2004). "[A] state court acts contrary to clearly established federal law if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent.'" Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1333 (11th Cir. 2009) (second and third alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 406, 120 S. Ct. 1495, 1519–20 (2000)). "An objectively unreasonable application of federal law occurs when the state court identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case . . . ." Rutherford, 385 F.3d at 1306 (internal quotation marks omitted). It may also occur when the state court "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id. (internal quotation marks omitted).

The Act imposes a "highly deferential standard for evaluating state-court rulings." Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002). It

21

requires that we "give[] the benefit of the doubt" to the decision of the state court. Id. "More than once the Supreme Court has instructed lower federal courts that the statute requires more than mere error, and more even than clear error, before federal habeas relief may be issued." Rutherford, 385 F.3d at 1307. As the Supreme Court recently reminded, the Act "prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. — , 130 S. Ct. 1855, 1866 (2010).

## III. DISCUSSION

Suggs argues that, during the penalty phase of his trial, Kimmel and Stewart failed to provide effective assistance in violation of the Sixth and Fourteenth Amendments to the Constitution. Suggs argues that Kimmel and Stewart should have more thoroughly investigated his background, had him examined by a mental health professional, and presented evidence of his mental health to the judge and jury at sentencing. He contends that Dr. Crown's testimony about his intellectual inefficiency and depression and evidence of his poor grades and good behavior while incarcerated would have reinforced each other and would have enabled the jury to understand better Suggs and his criminal behavior. Suggs argues that the Florida Supreme Court unreasonably applied Strickland when it concluded that Kimmel and Stewart's deficient performance did not undermine its confidence in

22

the outcome of the sentencing proceeding.

We need not review the decision of the Florida Supreme Court that Suggs proved deficient performance of counsel. The problem for Suggs is that the Florida Supreme Court ruled that he failed to prove prejudice. We address only that issue. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069; Grayson v. Thompson, 257 F.3d 1194, 1215 (11th Cir. 2001); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000).

We divide our discussion in two parts. First, we reject Suggs's argument that we should review de novo whether he has proved prejudice. Second, we reject Suggs's argument that the decision of the Florida Supreme Court that he failed to prove prejudice was objectively unreasonable.

*A. The Decision of the Florida Supreme Court Is Entitled to Deference.*

Suggs argues that, at the outset, we should not defer to the decision of the Florida Supreme Court that he had not proved prejudice. He argues that because the resolution of his claim of ineffective assistance of counsel in the state court "is dependent on an antecedent unreasonable application of federal law," we should "resolve the claim without the deference [the Antiterrorism and Effective Death Penalty Act] otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858–59 (2007). We are doubtful that all of the alleged errors that Suggs identifies are the sort of "antecedent unreasonable application[s] of federal

23

law" that, even if established, can cost a decision of a state court deferential review, but we address and reject Suggs's argument because the errors that Suggs identifies are not errors at all.

The Florida Supreme Court did not, as Suggs contends, "compartmentalize[] the specific components and address the prejudice from counsel's deficiencies separately." Suggs argues that the court decided whether the failure to present the testimony of a neuropsychologist was prejudicial and then decided whether the failure to gather and present mitigating school, prison, and medical records was prejudicial, but never "considered [the evidence] cumulative with the other undiscovered and/or undeveloped mitigating evidence." We disagree.

The Florida Supreme Court considered individually the prejudice that might have resulted from the various deficiencies that it identified, but then it explained, "We have evaluated the penalty phase of Suggs' trial as a whole, and we conclude that our confidence in the outcome is not undermined." Suggs II, 923 So. 2d at 436 (emphasis added). This sentence is sufficient evidence that the Florida Supreme Court considered "the totality of the available mitigation evidence," Land v. Allen, 573 F.3d 1211, 1221 (11th Cir. 2009) (internal quotation marks omitted), that would have been admitted had Kimmel and Stewart performed effectively. Reading the opinion in any other way is inconsistent with the requirement that we give the decision of the state court the benefit of the doubt. See Woodford, 537

24

U.S. at 24, 123 S. Ct. at 360.

The court also did not, as Suggs alleges, "premise[] [its decision] upon a legally erroneous conclusion that no prejudice can arise from a failure to investigate organic brain damage if the defendant had an average IQ score." The Florida Supreme Court instead recognized the relative weakness of Suggs's new mental health evidence. Suggs's normal intelligence quotient was but one consideration supporting the decision to reject Suggs's argument; the court also considered, for example, that "Suggs did not suffer from any major psychiatric disorder." Suggs II, 923 So. 2d at 435. The court announced no bright-line rule that an individual with an average intelligence quotient can never demonstrate prejudice from the failure to present mental health mitigation evidence.

The Florida Supreme Court also did not ignore either the vote of the closely divided jury or the fact of Suggs's depression. The Florida Supreme Court stated that "the jury recommended a death sentence by a seven-to-five vote." Id. at 423. When it discussed the evidence that Suggs presented in the collateral proceeding, the court also stated, "Dr. Crown testified that Suggs exhibits a 'depressed and morose affect.'" Id. at 434. The court did not restate these facts when it discussed the possibility that Kimmel and Stewart's errors prejudiced Suggs's defense, but, as we just said, the court explained that it had "evaluated the penalty phase of Suggs' trial as a whole." Id. at 436 (emphasis added). We do not doubt that the

25

vote of the jury or the fact of Suggs's depression were a part of this evaluation, and the Antiterrorism and Effective Death Penalty Act does not require the Florida Supreme Court to repeat or emphasize each piece of evidence that Suggs thinks significant. See Smith, 572 F.3d at 1333.

Finally, we do not agree with Suggs that the Florida Supreme Court erroneously "focus[ed] upon the number of aggravating circumstances that the judge identified in his sentencing order." In determining whether a petitioner was prejudiced by his attorney's inadequate performance, an appellate court must reweigh the new mitigation evidence "against the evidence in aggravation." Land, 573 F.3d at 1221 (internal quotation marks omitted); see also Williams, 529 U.S. at 397–98, 120 S. Ct. at 1515. The Florida Supreme Court performed that reweighing.

B. *The Decision of the Florida Supreme Court Was Not Unreasonable.*

To prove prejudice, Suggs had to "establish a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing, and that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." Wong v. Belmontes, 558 U.S. — , 130 S. Ct. 383, 386 (2009) (alteration in original) (internal quotation marks omitted). The Florida Supreme Court ruled that Suggs failed to satisfy that burden of proof. We must

26

decide whether that decision is unreasonable.

Our review of the record convinces us that the Florida Supreme Court reasonably concluded that Suggs failed to establish a reasonable probability of a different sentence. Indeed, it is reasonable to conclude that, if Kimmel and Stewart had presented Suggs's new evidence about his mental health, more members of the jury, not fewer members, would have recommended a sentence of death. The evidence of mitigation that Suggs developed in his collateral attack of his sentence is weak, and introducing it would have permitted the state to introduce compelling evidence of aggravation.

Dr. Crown's testimony and Suggs's school and prison records provide scant evidence of mitigation. Dr. Crown testified that Suggs has a deficit in neurological efficiency, which means that he has unusual difficulty with "language based critical thinking" as evidenced by several psychological tests. Suggs's prison records, which "indicate[] that Suggs exhibited good behavior and was released from prison on numerous occasions for short periods of time to attend important family events," Suggs II, 923 So. 2d at 436, support Dr. Crown's testimony that, as a result of his efficiency deficit, Suggs operates better in less complicated environments. Dr. Crown testified that Suggs's inefficiency might have impaired his ability to understand the long-term consequences of his acts and that Suggs was, after a period of incarceration under a sentence of death, morose and

27

exhibited a flat affect, but Dr. Crown also testified that Suggs has an average to above average intelligence quotient, obtained a general equivalency diploma, earned a gunsmithing certification that apparently required several thousand hours of training, has no major mental psychotic disorders besides depression, falls well within the normal range of general intellectual functioning and "can, in fact, use his brain." Dr. Crown's testimony is mostly consistent with the testimony of Suggs's family and friends.

It is reasonable to doubt that, taken as a whole, this evidence would have impressed a jury. Suggs is normal by many commonly understood indicators, including academic ability, vocational skill, interpersonal relationships, and employment history. As a child, Suggs was not a standout student, but not everyone is. See Newland v. Hall, 527 F.3d 1162, 1206 (11th Cir. 2008). As an adult, when he was not incarcerated, Suggs lived a normal life in which he worked regularly, completed a long course at a trade school, and helped around his family's house. In the light of these varied but consistent indicators of normality, a reasonable jury is likely to have been highly skeptical of a penalty-phase expert who, according to his own testimony, testifies "in many" habeas proceedings and "usually . . . on behalf of the defense" and who would have testified for Suggs about intellectual "efficiency." Cf. Lear v. Cowan, 220 F.3d 825, 829 (7th Cir.

28

2000).

Dr. Crown failed to explain how Suggs's intellectual inefficiency affects his ability to do anything other than perform as well as expected, when expectancy is based upon intelligence, on certain professionally administered psychological tests. Dr. Crown mentioned a possible impairment of Suggs's ability to appreciate the long-term consequences of his actions, but this testimony is difficult to square with real-world evidence. Suggs, for example, attended 3,000 hours of classes about gunsmithing, and a reasonable juror could have found that he did so in large part because of his appreciation of the long-term consequence (a valuable certification) of attendance.

Dr. Crown also did not explain how Suggs's inefficiency might have contributed to his decision to murder Casey or affected his moral culpability for that crime. Dr. Crown conceded that Suggs could plan a murder. Although Dr. Crown testified that Suggs has difficulty operating in complicated, distraction-filled environments, his testimony failed to explain Suggs's decision to rob, kidnap, and murder Casey while the two were alone at an isolated bar. There is no evidence that Suggs committed any of these crimes after being provoked or enraged during a chaotic episode.

The jury also would not likely have been surprised to learn that a convicted

29

murderer who has spent time in prison, been released, and then served time under a sentence of death is "morose" and exhibits a "flat affect." It certainly would not have surprised Dr. Larson, who "felt [any evidence of depressed mood] was understandable given" Suggs's incarceration. And, as we have said, Dr. Crown did not (nor do we think he could) tie Suggs's depressed affect to Casey's murder, which makes it "a weak mitigating factor." Wickline v. Mitchell, 319 F.3d 813, 821 (6th Cir. 2003) (internal quotation marks omitted).

It is also reasonable to conclude that the presentation of Suggs's weak evidence of mitigation would have come at a steep price. Dr. Crown would have testified that Suggs "had historically consumed alcohol and smoked marijuana" and "engaged in huffing, which is the inhalation of toxic fumes." This evidence, alone and in combination with the evidence that Suggs drank heavily for an "extensive period" before he murdered Casey, likely could have caused some jurors to vote in favor of death. As we have repeatedly recognized, evidence of drug and alcohol use "is often a 'two-edged sword,'" Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir.), cert. denied, 130 S. Ct. 190 (2009), that "provides an independent basis for moral judgment by the jury," Cade v. Haley, 222 F.3d 1298, 1306 (11th Cir. 2000). See Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1244 (11th Cir. 2003); Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir.

30

2001). Dr. Crown's testimony and Dr. Larson's report also would have established Suggs's average to above-average intelligence quotient of 102, and such testimony "may have been damaging . . . in the eyes of the judge and jury that sentenced him to death." Grayson, 257 F.3d at 1227 (addressing a full-scale score of 83). As the Florida Supreme Court recognized, the jury also would have heard that Suggs spent time at military school to address behavioral issues and this evidence "was potentially damaging." Suggs II, 923 So. 2d at 436. Kimmel testified at the evidentiary hearing that it "would [not] have been a good idea" to present evidence that Suggs had "been bad enough he had to be sent to military school." Kimmel, an experienced attorney who at the time of Suggs's trial had been practicing for 16 years, had been "board certified in criminal trials," had handled three capital cases, and had taught a "Life Over Death" seminar, is right. For similar reasons, it is reasonable to believe that supporting Dr. Crown's testimony with the evidence that Suggs fared well in the structured environment of prison would have negatively highlighted Suggs's earlier incarceration.

The state also would have been able to answer Suggs's evidence with Dr. Larson's report, which established that Suggs profiled as an individual with "antisocial tendencies" and that, consistent with that profile, Suggs tried to manipulate the mental health evidence so as to bolster his odds of successfully

31

vacating his sentence on appeal. This evidence is potentially aggravating as it suggests that Suggs has antisocial personality disorder, which "is a trait most jurors tend to look disfavorably upon," Reed v. State, 875 So. 2d 415, 437 (Fla. 2004) (internal quotation marks omitted), that "is not mitigating but damaging," Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368 (11th Cir. 2009). See Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 788 (11th Cir. 2003); Weeks v. Jones, 26 F.3d 1030, 1035 n.4 (11th Cir. 1994). At the very least, the evidence shows Suggs to be willing to manipulate the justice system so as to avoid the death penalty. In sum, "it would have been all too easy for the State to use [Suggs's] own mitigation witness to paint him as a violent, manipulative person with . . . drug-abuse issues and brushes with the law." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010).

We cannot say that the conclusion of the Florida Supreme Court that there is no reasonable probability that the jury would have returned a sentence other than death is objectively unreasonable. "[T]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." Rutherford, 385 F.3d at 1316. The trial court found seven aggravating circumstances, Suggs II, 923 So. 2d at 423 n.1, including that Suggs "acted with utter indifference to the suffering of this victim," and the Florida Supreme Court

32

rightly described this as a "brutal murder," id. at 436. Suggs does not contend that these aggravators are unsupported, or only weakly supported, by the record. This brutal murder was also carefully planned; the "entire criminal episode," as the trial court found, "reflects the defendant's careful plan to rob Mrs. Casey, kidnap her, kill her and hide her body, all with the aim of avoiding detection." Aggravating facts of this sort are difficult to overcome. See Grayson, 257 F.3d at 1226–27. Moreover, this brutal, carefully planned murder was committed for pecuniary gain by an individual on parole for a prior murder. These aggravating facts are even more difficult to overcome. Parker, 331 F.3d at 788–89; Daugherty v. Dugger, 839 F.2d 1426, 1432 (11th Cir. 1988).

Suggs has not provided evidence of mitigation that directly contradicts any of this evidence of aggravation, and he also has not provided evidence of mitigation that is sufficiently strong to outweigh it. See Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002). Moreover, as we have said, the mitigation evidence that Suggs would have offered would have come with other unfavorable evidence of historical drug and alcohol use, military school attendance, of his average to above-average intelligence, and Dr. Larson's report of "antisocial tendencies" and efforts to manipulate the mitigation evidence. The jury did not hear any of this evidence, and it still recommended that Suggs be sentenced to

33

death.  We cannot say that, with respect to this "particularly egregious crime," it was unreasonable to conclude that there is not a reasonable probability that adding extra evidence of aggravation, with a bit of testimony about intellectual efficiency, for the jury to consider would have done anything to "tip[] the balance in favor of mitigation."  Chandler v. United States, 218 F.3d 1305, 1328 (11th Cir. 2000) (en banc) (Cox, J., concurring).

Although Suggs needed to convince only one more juror to spare his life, we have affirmed the denial of federal habeas relief before when the jury was divided seven to five.  See Rutherford, 385 F.3d at 1305, 1315–16.  Suggs did not win five votes for life "[e]ven with . . . no defense at sentencing."  Hardwick v. Crosby, 320 F.3d 1127, 1191 (11th Cir. 2003).  Suggs cannot contend that his sentencing judge and jury "heard almost nothing that would humanize [Suggs] or allow them to accurately gauge his moral culpability."  Porter v. McCollum, 558 U.S. — , 130 S. Ct. 447, 454 (2009).  Kimmel and Stewart presented live and written testimony from family and friends to prove that Suggs was a decent person who did not deserve to die for his crimes.  The jury considered evidence necessary to "properly focus on the particularized characteristics of this petitioner."  Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989) (internal quotation marks omitted).

Closely divided capital juries do not move in only one direction when

presented with new evidence. We disagree with Suggs that the relevant question is whether "evidence of . . . organic brain damage would have in and of itself caused one more juror to vote for life." The question is whether evidence of Suggs's efficiency deficit along with any new unfavorable evidence would have caused at least one new juror to vote for life and no new jurors to vote for death. Each juror who participated in Suggs's penalty phase necessarily was willing to recommend a sentence of death. Fla. Stat. § 913.13. Even if one of the original seven votes for death would have viewed Suggs's new evidence of mitigation favorably, it is reasonable to conclude that some jurors who voted for life would have reconsidered had they known what we now know about Suggs. Even in the light of the closely divided sentencing jury, the decision about prejudice of the Florida Supreme Court, whether or not it "was <u>correct</u>, . . . was clearly <u>not</u> <u>unreasonable</u>." <u>Lett</u>, 130 S. Ct. at 1866.

## IV. CONCLUSION

The denial of Suggs's petition for a writ of habeas corpus is **AFFIRMED**.