[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13797

_____

D.C. Docket No. 6:08-cv-00619-GAP-KRS

CHADWICK WILLACY,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 12, 2017)

ON PETITION FOR REHEARING

Before MARCUS, WILLIAM PRYOR and JILL PRYOR, Circuit Judges.

PER CURIAM:

Petitioner Chadwick Willacy moved for panel rehearing and rehearing *en banc* of an opinion originally filed on March 30, 2017. We grant the motion for panel rehearing,[1] vacate our prior opinion, and substitute the following opinion. In this opinion, we add footnote 7 to address Willacy's argument that the panel opinion misapplied *Estelle v. McGuire*, 502 U.S. 62 (1991). We do not alter the opinion in any other respect.

In this capital case, Chadwick Willacy appeals the district court's denial of his federal habeas petition. Willacy was convicted and sentenced to death for the brutal murder of his next door neighbor, which he carried out to cover up the fact that he had robbed her. After the Florida Supreme Court vacated his first death sentence on an issue unrelated to this appeal, Willacy received a new sentencing phase and again received a death sentence. Following an unsuccessful direct appeal from that sentence and collateral proceedings in the Florida state courts, Willacy filed a federal habeas petition in the United States District Court for the Middle District of Florida, which the district court denied.

Willacy appeals the rejection of his petition on three grounds. First, he contends that he was denied the right to a fair trial because the State failed to inform the trial court of the fact that the jury foreman, Edward Clark, was under

_____

[1] Under Eleventh Circuit Rule 35-5, "[a] petition for rehearing en banc will also be treated as a petition for rehearing before the original panel," which is how we are treating Willacy's petition.

2

prosecution during the trial and therefore ineligible for jury service. Second, he asserts that his trial counsel was constitutionally ineffective because counsel failed to inquire adequately during voir dire into juror Clark's status. Third, Willacy contends that his trial counsel rendered ineffective assistance in investigating and presenting to the jury a case in mitigation of the death penalty.

After a thorough review of the briefing and the record, and with the benefit of oral argument, we affirm the denial of Willacy's petition.[2] With regard to both claims based on juror Clark's alleged prosecution, the Florida Supreme Court held that Clark's participation in a pretrial intervention program did not amount to a prosecution under state law, and we cannot disturb that finding. Thus, Willacy's claims that he was denied a fair trial due to Clark's status and that trial counsel rendered ineffective assistance in failing to inquire further into Clark's status necessarily must fail. As regards the claim that trial counsel rendered ineffective assistance at the penalty phase, we conclude that Willacy has failed to demonstrate that his counsel's performance prejudiced his proceedings.

## I.    FACTUAL BACKGROUND

Willacy was convicted in Florida of first degree premeditated murder, burglary, robbery, and arson. A jury initially recommended a death sentence by a vote of 9 to 3, which the trial court accepted. Willacy appealed, and the Florida

---

[2] Willacy's motion to stay further appellate proceedings is DENIED.

Supreme Court affirmed his conviction but vacated his death sentence due to a problem involving a prospective juror not relevant to this appeal. *See Willacy v. State* ("*Willacy I*"), 640 So. 2d 1079 (Fla. 1994). On remand, a jury voted 11 to 1 to recommend a death sentence, and the trial court again accepted the recommendation. The Florida Supreme Court upheld this second death sentence, *see Willacy v. State* ("*Willacy II*"), 696 So. 2d 693 (Fla. 1997), which is the sentence relevant to the instant proceedings. Below we recount the events that led to Willacy's conviction and sentence, evidence adduced at his state postconviction proceedings, and the course of his federal habeas proceedings.

## A. Facts Elicited at Trial

Marlys Sather, the victim in this case, returned home from work around lunchtime unexpectedly and found Willacy, her next door neighbor, burglarizing her house. *Willacy II*, 696 So. 2d at 694; *see also Willacy v. State* ("*Willacy III*"), 967 So. 2d 131, 135 (Fla. 2007) (affirming the denial of postconviction relief). Willacy bludgeoned Sather, bound her ankles with wire and duct tape, and "choked and strangled her with a cord with a force so intense that a portion of her skull was dislodged." *Willacy III*, 967 So. 2d at 135. Willacy obtained Sather's car keys and ATM pin number and card, drove her car to her bank, and withdrew money out of her bank account. *Id.* He then drove back to Sather's house, hid her car around the block, and made several trips from Sather's house to her car with stolen items in

4

tow. *Id.* After taking "a significant amount of property" from Sather's house, Willacy drove the car to a nearby plaza, left it, and jogged back to Sather's house. *Id.*

Willacy went back inside and, apparently to conceal evidence of his crimes, set Sather's body on fire. He disabled the house's smoke detectors, doused Sather with gasoline he found in the garage, placed a fan from Sather's guest room at her feet to provide oxygen for the fire, and struck several matches to set her body ablaze. *Id.* According to the medical examiner's testimony at trial, Sather was alive when Willacy set her body on fire; her death was caused by inhalation of smoke from her burning body. *Id.* The State also entered into evidence for the jury's review several photographs law enforcement took of Sather's body after the murder.

At trial, the State offered ample evidence that Willacy was the perpetrator of Sather's murder. Witnesses reported seeing a man matching Willacy's description near Sather's house and driving her car on the day of the murder. *Id.* Investigators found Willacy's fingerprints on several items at Sather's house, including the fan at Sather's feet and the gas can. *Id.* Willacy's girlfriend contacted the police when she discovered a woman's check register in Willacy's wastebasket, and police identified the register as belonging to Sather. *Id.* When police obtained a search

5

warrant on Willacy's home, they recovered some of Sather's property and several articles of clothing containing blood consistent with Sather's blood type. *Id.*

Based on this evidence, the jury found Willacy guilty of first degree premeditated murder, burglary, robbery, and arson.[3]

## B. Motion for New Trial

Following his conviction and first death sentence, Willacy moved for a new trial. As relevant to this appeal, Willacy asserted that he was denied a fair trial because the State failed to disclose that jury foreman Clark was at the time of the trial under prosecution. Testimony adduced at an evidentiary hearing showed that Clark had been arrested approximately eight months before trial and charged with grand theft. His case was submitted for a pretrial intervention program ("PTI") coordinated by Christopher White, the lead prosecutor on Willacy's case. Clark was accepted into PTI five days before jury selection began in Willacy's case but did not receive notice of his acceptance into PTI until after he was seated as a juror.[4] White had knowledge of Clark's participation in the program during Willacy's trial but failed to inform the trial judge.

---

[3] Although the jury subsequently recommended a death sentence and the trial judge imposed one, as noted above this sentence was overturned on appeal. Thus, we do not recount the facts pertinent to that first penalty phase proceeding.

[4] Clark signed an agreement to participate in the program in exchange for a term of probation after Willacy was convicted.

Florida law at the time of Willacy's trial provided that "[n]o person who is under prosecution for any crime . . . shall be qualified to serve as a juror."  Fla. Stat. § 40.013(1) (1991).  Willacy argued:

> [T]he state had a legal obligation to inform the court as well as the defense upon learning this information.  However, the state only made a half-hearted and ineffective effort to inform the defense, they failed to follow up on the information to confirm it, and they *totally failed to inform the court*.  The result of these defaults was to deprive defendant of a lawfully constituted jury, requiring a new trial.

Memorandum of Law in Support of Defendant's Motion for New Trial, R. 3656 (emphasis added).  In support, Willacy cited several cases concerning a party's right to a fair trial, including three addressing a criminal defendant's Sixth Amendment fair trial right.[5]   The trial court denied the motion for new trial.

---

[5] We reject the State's contention and the district court's conclusion that Willacy's fair trial claim is procedurally barred from our review.  The district court found that this claim was barred because "it was raised on direct appeal and decided adversely to Petitioner," and "[i]t does not appear that Petitioner raised this claim in his appeal of the denial of his motion for postconviction relief."  Doc. 84 at 21.  But the district court's own finding demonstrates why Willacy's claim is properly before this Court.

A petitioner must give the state courts "one full opportunity to resolve [his claim] by invoking one complete round of the State's established appellate review process."  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In so doing, the petitioner must "fairly present" his claim to the state courts.  *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010).  Willacy has done both.

Willacy fairly presented his claim that the State violated his right to a fair trial by asserting in his motion for new trial and direct appeal to the Florida Supreme Court that the State's failure to inform the trial court of Clark's status was error and by citing and discussing Sixth Amendment fair trial case law.  Although Willacy's arguments throughout this direct review process were less refined than they are now, we conclude that a "reasonable reader would understand the claim's particular legal basis and specific factual foundation" to be the same here as in the state courts.  *Pope v. Sec'y, Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alterations and internal quotation marks omitted).  Indeed, the state postconviction trial court understood the claim Willacy asserted on direct review to be based on his "right to a fair trial,"

7

## C. First Direct Appeal

The Florida Supreme Court affirmed the denial of Willacy's motion for new trial, concluding, as to juror Clark: "Willacy mistakenly equates Clark's placement in the Pretrial Intervention Program with prosecution. Pretrial intervention is merely an alternative to prosecution. Since Clark was not under prosecution, Willacy's motion for a new trial was properly denied." *Willacy I*, 640 So. 2d at 1082-83 (citation and internal quotation marks omitted). Nevertheless, because the trial court erroneously denied the defense an opportunity to rehabilitate a prospective juror when the juror expressed concern about recommending the death penalty, the Florida Supreme Court vacated Willacy's death sentence and remanded for a new sentencing hearing. *Id.* at 1082.

## D. Resentencing Proceedings

the same right he has asserted in federal court. Order Denying in Part Defendant's Amended Motion for Postconviction Relief at 3, 5.

Willacy thus gave the state courts "one full opportunity" to address and resolve his claim that his right to a fair trial was violated when the State failed to notify the trial court of Clark's status. *Boerckel*, 526 U.S. at 845. Nothing more was required. *See id.* To exhaust a claim, a petitioner does not have "to ask the state for collateral relief, based on the same evidence and issues already decided by direct review." *Id.* at 844. In any event, the State expressly waived any exhaustion defense in its pleadings to the district court. *See* Response to Amended Petition, Doc. 75 at 25 ("Petitioner has exhausted each of the 12 issues raised in the habeas petition. To the extent Petitioner may not have exhausted any part of a claim, Respondents waive exhaustion and note that any such claim would be procedurally defaulted."). A "state's explicit waiver of [the exhaustion] defense before the district court forecloses it being asserted here." *Dorsey v. Chapman*, 262 F.3d 1181, 1187 (11th Cir. 2001).

Willacy fairly presented his fair trial claim to the state courts throughout one full round of state appellate review. Thus, his claim is not subject to a procedural bar.

At the sentencing phase at issue here, the State called a number of witnesses to testify to explain to the new jury the crime and the evidence linking Willacy to it. *See Willacy II*, 696 So. 2d at 694. The State also presented the testimony of Sather's son and two daughters to illustrate for the jury the impact of her death. Each of Sather's adult children testified to the close relationship Sather shared with her children and grandchildren and to the grief and loss they had experienced as a result of the murder.

Defense counsel presented nine witnesses in mitigation, all friends and family of Willacy's. The witnesses, who all knew Willacy as a child, testified to his positive traits—namely, that he was a considerate, respectful, thoughtful, and well-liked child and adolescent. Several of these witnesses also testified that Willacy had a drug problem: he became addicted to crack cocaine in high school and sought treatment, although he later relapsed. Willacy's younger sister Heather and two of his childhood friends testified that Willacy enjoyed a strong relationship with his family. But Willacy's mother and father told the jury that his father, Colin Willacy, was "very hard" on his children. Ex. G-19 at 2826 (testimony of Audrey Willacy); *id.* at 2836 (testimony of Colin Willacy). Colin testified that he "inflicted corporal punishment if . . . Chad were to do anything, and never once would Chad in any way respond . . . in a violent way." *Id.* at 2837.

9

After hearing this testimony, the jury recommended a death sentence by a vote of 11 to 1. *Willacy III*, 967 So. 2d at 136. The trial judge found five aggravating circumstances: the homicide was (1) committed in the course of a felony; (2) committed to avoid lawful arrest; (3) committed for pecuniary gain; (4) especially heinous, atrocious, or cruel ("HAC"); and (5) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"). *See id.* at 136 n.4. The judge found no statutory mitigating factors and 31 nonstatutory mitigating factors, all of which it found carried little weight. *See id.* at 136 & n.5 (listing nonstatutory mitigating factors). After weighing these factors, the judge adopted the jury's recommendation and imposed a death sentence.

## E. Second Direct Appeal and State Postconviction Proceedings

The Florida Supreme Court affirmed Willacy's death sentence on direct appeal. *Willacy II*, 696 So. 2d 693 (Fla. 1997), *cert. denied*, 522 U.S. 970 (1997). Willacy then initiated state postconviction proceedings, in which, as relevant here, he asserted that counsel from the guilt phase of his trial, Kurt Erlenbach, rendered ineffective assistance in failing to conduct adequate voir dire of jury foreman Clark; and counsel from the guilt phase of his trial, James Kontos, rendered ineffective assistance in failing to investigate and present an adequate case in mitigation of the death penalty. The trial court conducted an evidentiary hearing

10

on both of these claims.  We recount the testimony relevant to Willacy's penalty phase ineffective assistance claim below.  With respect to his guilt phase ineffective assistance claim, however, we need not recount the testimony adduced because, as we discuss in Part III.A, the Florida Supreme Court's determination that Clark was not under prosecution within the meaning of state law forecloses this claim entirely.  *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[T]he failure to raise nonmeritorious issues does not constitute ineffective assistance.").

As we detail below, we assume for purposes of analyzing Willacy's penalty phase ineffective assistance claim under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), that trial counsel performed deficiently.  Thus, we do not recount Kontos's testimony.  Rather, we focus on the evidence adduced at the postconviction evidentiary hearing and whether that evidence, when combined with the mitigation Kontos presented and reweighed against the evidence in aggravation, would have led to a reasonable probability of a different outcome.  *See id.* at 695.

Postconviction counsel introduced roughly two types of evidence at Willacy's evidentiary hearing:  evidence of (1) childhood physical abuse; and (2) mental health problems, including substance abuse in adolescence and adulthood. We discuss these in turn.

11

Willacy's three family members who testified during the penalty phase—his sister Heather and his parents, Audrey and Colin—testified at the postconviction evidentiary hearing about Colin's physical abuse of his wife and children. Heather and Audrey recounted that Colin often drank to excess, and when he did, he would become physically violent with his wife and children. Heather testified that she and her brother would cry together when they witnessed their father hit their mother. Both Heather and Audrey testified that Willacy bore the brunt of his father's abuse, often for little reason or none at all, beginning when he was eight years old and continuing until his mid to late teens. Some of the beatings were severe: on one occasion that all three family members recounted, Colin beat Willacy with a broken chair leg. Colin admitted that his beatings of Willacy worsened as Willacy grew older, recalled threatening to kill Willacy, and testified that he once broke a broomstick on Willacy while beating him. The family testified that Willacy's parents kicked him out of the house when he was a teenager and that he was homeless for a time.

Postconviction counsel called a licensed psychologist, Dr. William Riebsame, to testify about Willacy's drug abuse and mental illness, as well as the impact of the abuse he suffered at the hands of his father. Dr. Riebsame had performed an initial competency evaluation on Willacy before trial, but he conducted a more extensive evaluation in preparation for postconviction

12

proceedings.  In addition to corroborating the testimony of Willacy's family members regarding the physical abuse Willacy suffered, Dr. Riebsame testified that Willacy met the diagnosis for cocaine abuse, cannabis abuse, alcohol abuse, Attention Deficit Hyperactive Disorder ("ADHD") and Antisocial Personality Disorder.  Dr. Riebsame acknowledged that as a child Willacy had threatened to kill someone, started a fire at school, and killed small animals, reporting that such behavior is common in children who suffer chronic and severe physical abuse.  Dr. Riebsame also noted a "significant correlation" between this kind of childhood abuse and an Antisocial Personality Disorder diagnosis in adulthood.

In addition to these diagnoses, Dr. Riebsame opined that, at the time of the offense, Willacy likely met the criteria for cocaine intoxication and cocaine withdrawal.  In his view, Willacy met the statutory mitigator of having committed the offense while under the influence of extreme mental or emotional disturbance, citing Willacy's crack cocaine binge and ADHD symptoms.[6]

The State called psychiatrist Dr. Jeffrey Danziger, who evaluated Willacy and reviewed Dr. Riebsame's conclusions.  Dr. Danziger did not dispute Willacy's history of child abuse (which he acknowledged could be mitigating), nor did he disagree with Dr. Riebsame's conclusions that Willacy met the diagnoses for cannabis abuse, cocaine abuse, and alcohol abuse.  Dr. Danziger did, however,

---

[6] *See* Fla. Stat. § 921.141(6)(b) (now codified at § 921.141(7)(b)).

13

disagree with Dr. Riebsame's assessment that Willacy was under extreme mental or emotional disturbance at the time of the offense. He also expressed doubt that Willacy suffered from ADHD. Other than the abuse Willacy endured as a child, Dr. Danziger found nothing mitigating in his background.

Dr. Danziger, like Dr. Riebsame, diagnosed Willacy with Antisocial Personality Disorder. He testified to "reports of torture of animals including . . . burying animals up to their necks and running them over with lawnmowers as a child." Dr. Danziger agreed with Dr. Riebsame that child abuse and Antisocial Personality Disorder were correlated.

The trial court rejected Willacy's ineffective assistance claim, the Florida Supreme Court affirmed, and the Supreme Court of the United States denied Willacy's petition for writ of certiorari. *See Willacy III*, 967 So. 2d at 142-44, *cert. denied sub. nom.*, *Willacy v. Florida*, 552 U.S. 1265 (2008). Based on the evidence adduced at the state postconviction evidentiary hearing, the Florida Supreme Court concluded that Willacy failed to show counsel performed deficiently or that any deficiency prejudiced him. *Id.*; *see Strickland*, 466 U.S. at 687 (explaining that, to establish ineffective assistance of counsel, the defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense").

14

The Florida Supreme Court held that counsel was not deficient in choosing to present Willacy's positive attributes, rather than negative qualities, in an attempt to present him as a life worth saving. *Willacy III*, 967 So. 2d at 143-44. With respect to prejudice, the Florida Supreme Court opined that "presenting this mitigating evidence would likely have been more harmful than helpful," acknowledging "that antisocial personality disorder is a trait most jurors tend to look disfavorably upon." *Id.* at 144 (internal quotation marks omitted); *see also id.* ("An ineffective assistance claim does not arise from the failure to present mitigating evidence where that evidence presents a double-edged sword."). "Thus, there is no reasonable probability that the outcome of the proceeding would have been different if Kontos had chosen to focus on Willacy's abuse and mental health issues rather than on the positive aspects of Willacy's life." *Id.*

## F. Federal Habeas Proceeding

After he had exhausted his state appeals, Willacy filed a petition for a writ of habeas corpus in federal district court, raising several claims including his fair trial and ineffective assistance of counsel claims. The district court denied Willacy relief and denied him a certificate of appealability. We granted Willacy a certificate of appealability on his claims that his right to a fair trial was violated when the State failed to inform the trial court of Clark's ineligibility to serve as a juror, trial counsel rendered ineffective assistance in failing to conduct adequate

15

voir dire of Clark to discover his ineligibility, and trial counsel's investigation and presentation of mitigating evidence at Willacy's penalty phase was constitutionally deficient.

## II.    STANDARD OF REVIEW

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (internal quotation marks omitted). An ineffective assistance of counsel claim "presents a mixed question of law and fact that we review *de novo*." *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1261 (11th Cir. 2014). So too does a claim that a juror's potential bias violated a petitioner's right to a fair trial. *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Because the Florida state courts decided each of Willacy's three claims on the merits, we must review these claims under the standards set by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

16

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). With respect to § 2254(d)(2), "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015).

## III.    DISCUSSION

### A. Fair Trial and Guilt Phase Ineffective Assistance of Counsel Claims

Two of the claims in Willacy's certificate of appealability—his fair trial claim and his guilt phase ineffective assistance of counsel claim—are founded on the same assertion: that jury foreman Clark was under prosecution during Willacy's trial and therefore was ineligible to serve as a juror under Florida law. *See* Fla. Stat. § 40.013(1) (1991). Based on this assertion, Willacy contends that the State's failure to bring the fact of Clark's prosecution to the attention of the trial court resulted in the deprivation of his right to a fair trial. And, Willacy

17

argues, in failing to question Clark effectively during voir dire to reveal this pending prosecution, trial counsel rendered ineffective assistance in violation of Willacy's right to counsel.  Both of these claims must fail:  the Florida Supreme Court determined that Clark was not under prosecution within the meaning of Florida law, and "[w]e are not at liberty to challenge" that conclusion.  *Cargill v. Turpin*, 120 F.3d 1366, 1381 (11th Cir. 1997).

The Supreme Court has warned that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991) (concluding that a federal due process claim based on the alleged improper admission of evidence must fail when that evidence was in fact properly admitted under state law).  Here, the Florida Supreme Court dismissed Willacy's argument that Clark's placement in PTI was equivalent to prosecution under Florida law, holding that "[p]retrial intervention is merely an alternative to prosecution," and "Clark was not under prosecution."  *Willacy I*, 640 So. 2d at 1082-83 (internal quotation marks omitted).  Under *Estelle*, we cannot disturb the Florida Supreme Court's determination.

The Florida Supreme Court's conclusion that Clark was not under prosecution precludes relief on Willacy's fair trial and guilt phase ineffective

18

assistance of counsel claims.  Willacy's fair trial claim based on Clark's status is foreclosed because under Florida law Clark was eligible to serve on the jury (and not considered to harbor a potential for bias).[7]  Willacy's ineffective assistance of counsel claim based on Clark's status also fails because more effective voir dire would not have revealed Clark's ineligibility to serve as a juror.  *See Bolender*, 16 F.3d at 1573 ("[T]he failure to raise nonmeritorious issues does not constitute ineffective assistance.").

Accordingly, we affirm the denial of relief on both of these claims.

## B. Penalty Phase Ineffective Assistance of Counsel Claim

Willacy asserts that his trial counsel was ineffective in failing to investigate and present evidence about his history of childhood physical abuse and mental health problems during the penalty phase and that there is a reasonable probability

---

[7] Although the Florida Supreme Court's determination that Clark was not under prosecution does not necessarily foreclose any argument that Clark was biased, *see Estelle*, 502 U.S. at 68, it forecloses Willacy's claim for relief.  This is because Willacy did not meaningfully argue in state or federal district court that Clark was unconstitutionally biased notwithstanding his eligibility to serve.  As our precedent makes clear, juror eligibility does not necessarily end the bias inquiry.  *See Rogers v. McMullen*, 673 F.2d 1185, 1188 (11th Cir. 1982).  An eligible juror may still have "actual or implied" bias such that his empanelment would result in an unconstitutional conviction.  *See United States v. Wood*, 299 U.S. 123, 133 (1936) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law.").  But Clark's eligibility ends the inquiry in this case.  At best, Willacy made passing references to the notion of actual or implied bias, but even those references were tethered to Clark's alleged ineligibility to serve as a juror as a matter of state law.  This was insufficient to put the state courts and the district court on notice of any argument that Clark, despite being eligible, was a biased juror.  *See Butts v. GDCP Warden*, 850 F.3d 1201, 1208 (11th Cir. 2017) ("Passing references are not enough to present and preserve an issue.").  Indeed, for this reason, Willacy lacks a certificate of appealability on any claim that Clark was biased notwithstanding his eligibility to serve.

19

that, had the jury heard that evidence, it would have recommended a sentence other than death.  Under *Strickland*, a defendant has a Sixth Amendment right to effective assistance of trial counsel.  466 U.S. at 686.  Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

We assume for present purposes that Willacy's trial counsel rendered deficient performance in failing to investigate and present a sufficient case in mitigation.  *See Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1283-84 (11th Cir. 2013) (making "simplifying assumptions in favor of the petitioner" to facilitate the Court's analysis, including assuming deficient performance and addressing *Strickland*'s prejudice prong only).  Thus, we must decide whether counsel's deficient performance prejudiced Willacy in the penalty phase of his trial, considering in addition to the testimony counsel actually elicited at the penalty phase the childhood abuse and mental health evidence adduced at the postconviction evidentiary hearing.

20

Applying AEDPA's deferential standard of review, we conclude that the Florida Supreme Court reasonably determined that Willacy suffered no prejudice from his counsel's failure to present mitigation testimony regarding his history of physical abuse, substance abuse, and other mental health problems. The physical abuse Willacy witnessed and suffered indisputably is mitigating. *See Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (considering evidence of physical abuse petitioner suffered to be mitigating). But the mental health evidence adduced at Willacy's postconviction hearing presented a double-edged sword that could have harmed Willacy's case for a life sentence as much or more than it would have helped.

We have said—just as the Florida Supreme Court said in Willacy's case— that Antisocial Personality Disorder is "a trait most jurors tend to look disfavorably upon." *Suggs v. McNeil*, 609 F.3d 1218, 1231 (11th Cir. 2010) (internal quotation marks omitted); *see Willacy III*, 967 So. 2d at 144. Indeed, we have elaborated that evidence of Antisocial Personality Disorder "is not mitigating but damaging." *Suggs*, 609 F.3d at 1231 (internal quotation marks omitted); *see Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc) (characterizing evidence of antisocial tendencies as amongst "the strongest possible evidence in rebuttal" of mitigating mental health evidence). And "evidence of behavioral

21

problems while attending school may be potentially damaging and unfavorable."

*Evans*, 703 F.3d at 1329 (internal quotation marks omitted).

We also have observed that "evidence of a defendant's drug addiction . . . is often a 'two-edged sword':  while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence."  *Pace v. McNeil*, 556 F.3d 1211, 1224 (11th Cir. 2009) (holding that counsel's failure to introduce evidence of petitioner's crack addiction in the months leading up to the murder did not constitute ineffective assistance).  Indeed, evidence of drug and alcohol abuse, "alone and in combination with the evidence that" a defendant was acutely intoxicated at the time of the murder "could [cause] some jurors to vote in favor of death" by supplying the jury "an independent basis for moral judgment."  *Suggs*, 609 F.3d at 1231 (internal quotation marks omitted).

When we consider this new mitigating evidence (much of which could have been more harmful than helpful) together with the mitigation evidence presented at trial—that Willacy was considerate, respectful, thoughtful, and well-liked as a child and adolescent, had a close (if fraught) bond with his family, and sought treatment for his drug addiction—and weigh it against the evidence in aggravation, we conclude that the Florida Supreme Court's no-prejudice determination was based a reasonable application of *Strickland*.

22

Furthermore, "[t]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." *Sochor v. Sec'y, Dep't of Corr.*, 685 F.3d 1016, 1030 (11th Cir. 2012) (internal quotation marks omitted). After the jury recommended a death sentence, the trial judge found that the prosecution proved five aggravating circumstances, including CCP and HAC. The Florida courts consistently have recognized "that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme." *Brown v. State*, 143 So. 3d 392, 405 (Fla. 2014). The evidence adduced at Willacy's postconviction evidentiary hearing would not have reduced the impact of these powerful aggravators sufficiently to undermine our confidence in the outcome of his penalty phase proceedings.

Evidence elicited at the postconviction hearing would not have mitigated the strength of the HAC aggravator, which "'pertains more to the nature of the killing and the surrounding circumstances'" than the petitioner's mental state. *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 561 (11th Cir. 2015) (quoting *Stano v. State*, 460 So. 2d 890, 893 (Fla. 1984)). And the weight of the HAC aggravator was extremely strong in this case. The State introduced evidence to the jury that Sather was bludgeoned, bound by the ankles with wire and duct tape, and choked and strangled with a cord with a force so intense that a small portion of her skull was dislodged. She was left in this condition—alive—for some time while

23

Willacy plundered her home.  Ultimately, Willacy burned Sather alive, and she died from smoke inhalation from her own burning body.  The jury saw graphic photographs that demonstrated the extent of Sather's injuries as a result of Willacy's brutal attack.

The abuse Willacy witnessed and suffered[8] might have shifted somewhat the balance between the remaining aggravators (including the strong CCP aggravator) and mitigating factors in this case.  And if the jury had credited Dr. Riebsame's testimony, Willacy's extreme mental or emotional disturbance might have mitigated to some extent the strength of the CCP aggravator.  Nevertheless, considering the "extremely aggravated" nature of the murder, we cannot say that any shift would have been so great as to permit us to set aside the Florida Supreme Court's conclusion that the new evidence was insufficient to give rise to a reasonable probability of a sentence other than death.  *Crawford v. Head*, 311 F.3d 1288, 1320-22 (11th Cir. 2002) (concluding that "there was no reasonable probability that" evidence that a petitioner grew up with an alcoholic and abusive father, "while . . . mitigating, . . . would have convinced the jury to impose life rather than death in light of the extremely aggravated nature of the crime involved").  Thus, we conclude that the Florida Supreme Court's determination

---

[8] We recognize that the jury heard some evidence that Willacy's father had used corporal punishment.  Here we consider the increased impact of the much more fulsome evidence of physical abuse adduced at the postconviction evidentiary hearing.

24

that Willacy cannot show prejudice withstands our deferential review under AEDPA, and we affirm the denial of relief on his penalty phase ineffective assistance of counsel claim.

## IV.    CONCLUSION

The district court's denial of Willacy's petition for a writ of habeas corpus is affirmed.

**AFFIRMED.**